520 F.2d 1084
 89 L.R.R.M. (BNA) 2961, 77 Lab.Cas. P 11,001
 Ernest GABAUER, Plaintiff-Appellant,
v.
Leonard WOODCOCK and Emil Mazey, Defendants-Appellees,
and
International Union, United Automobile, Aerospace and
Agricultural Implement Workers of America (UAW),
and its Local Union No. 25,
Intervenor-Defendants-Appellees.
 No. 74-1761.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 14, 1975.
Decided July 16, 1975.
Rehearing and Rehearing En Banc Denied Oct. 1, 1975.
 
 Donald W. Jones, Springfield, Mo., for plaintiff-appellant.
 M. Jay Whitman, Detroit, Mich., for defendants-appellees.
 Before VAN OOSTERHOUT and JONES,* Senior Circuit Judges, and HENLEY, Circuit Judge.
 VAN OOSTERHOUT, Senior Circuit Judge.
 
 
 1
 This case is an action for damages by plaintiff Ernest Gabauer under §§ 102 and 609 of the Landrum-Griffin Act, 29 U.S.C. §§ 412, 529, for infringement of plaintiff's freedom of speech and due process rights under Title I of the Act, 29 U.S.C. § 411(a)(1), (2) and (5). Count II of plaintiff's complaint alleges common law libel against individual defendants Leonard Woodcock, President of the United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), and Emil Mazey, Secretary-Treasurer of the UAW. Diversity of citizenship was asserted as a basis for jurisdiction on Count II. Against plaintiff's strenuous objections the international (UAW) and local (Local 25) unions were allowed to intervene as party defendants.[1] At the close of all of the evidence the trial court[2] granted defendants' motion for a directed verdict on both counts of Gabauer's complaint. We affirm on both Counts I and II.
 
 
 2
 Filed separately this date are companion and factually similar cases, Huskey v. Woodcock, 8 Cir., 520 F.2d 1096, and Huskey v. UAW, 8 Cir., 520 F.2d 1096, which were assigned to Judge H. Kenneth Wangelin, District Judge, Eastern District of Missouri. The UAW's appeal from a $115,000 judgment entered against it on Count II, and Huskey's cross-appeal from judgment in favor of all defendants on Count I were argued together with this case. To avoid repetition, the facts and discussion of the applicable law for both cases are found in this opinion.
 
 
 3
 At all times relevant Gabauer and Claude Huskey were members of the UAW and Local 25 of the UAW in St. Louis, Mo. They were both employees of General Motors' Chevrolet Unit in St. Louis. Both had been employed there since 1957 or 1958.
 
 
 4
 In 1968 Gabauer was Chairman of the Shop Committee in the Chevrolet Unit of Local 25. Huskey was a district committeeman in the same Unit.[3] In 1969 a strike occurred at the General Motors plant which began April 10th and ended June 6th of that year. Gabauer, Huskey and other local committeemen of the Chevrolet Unit opposed this strike by voting against it and by advising defendant Woodcock, then vice-president of the UAW, of their opposition by letter dated April 1, 1969. Woodcock, through local UAW officers, attempted unsuccessfully to persuade Huskey and other Chevrolet Unit committeemen to support the strike. The "Green and White" slate, as Gabauer, Huskey and their political faction were known, made their opposition to the 1969 strike the basis for Huskey's and Gabauer's successful campaign for election in March of 1970 as delegates to the national UAW convention.
 
 
 5
 In June 1969 shortly after the strike ended Gabauer was re-elected Chairman of the Shop Committee and Huskey was elected a zone committeeman. On June 17, 1969, a formal protest was filed by an opposing political union faction challenging the election of Huskey and two others to zone committee positions. The protest alleged that the election zones in question had not been approved by the members as required by the UAW constitution; that a General Motors-UAW agreement required agreement by General Motors to any redistricting; and that existing election zones had been gerrymandered by changing the departments to be included in each one. A hearing was held and the local union election committee recommended that new elections be held in the disputed zones. On appeal the Special Appeals Committee of the UAW Executive Board recommended and the Executive Board adopted the recommendation that the Chevrolet Unit Shop Committee negotiate a written redistricting agreement with General Motors and present it to the membership for ratification before the next elections which were to be held in June 1970. This was not done and on June 1, 1970, the Shop Committee was called to the regional office in St. Louis and informed that if they did not negotiate, sign and have a redistricting agreement ratified as directed by the Executive Board of the UAW they would be removed from office. Huskey did not but Gabauer did attend this meeting. Huskey was aware of the results of the meeting. The Shop Committee members present at the meeting refused to abide by the Board's directive.
 
 
 6
 Local 25 had scheduled elections for June 16 and 17, 1970, to elect zone committeemen pursuant to by-laws of the local and the UAW Constitution. Because of the size of the Chevrolet Unit, committeemen were to be chosen on an at-large basis to avoid the possibility of gerrymandering. The Shop Committee proposed to assign elected zone committeemen to districts pursuant to a redistricting agreement negotiated with General Motors after the election. Gabauer and Huskey were announced candidates for the chairman and at-large committeemen positions respectively. One day after the notice of elections was posted, Kenneth Worley, Director of Region 5 of the UAW, appeared before the Executive Board of the UAW and requested the Board to hold a show cause hearing for the purpose of imposing a trusteeship on Local 25 pursuant to the requirements of Title III of the Landrum-Griffin Act, 29 U.S.C. § 461 et seq. A show cause hearing which Huskey was unable to attend was held on June 12, 1970. Gabauer attended this hearing. Gabauer and a majority of the Shop Committee continued to refuse to negotiate, sign and present a redistricting agreement to the membership for ratification. At the close of the hearing the Executive Board voted to impose a trusteeship over the Chevrolet Unit of Local 25. Worley was appointed Administrator of the Trusteeship with authority to cancel the proposed elections which he did immediately. Reasons stated by the Board for imposition of the Trusteeship were: (1) Refusal by the Shop Committee of the Chevrolet Unit to carry out the redistricting directive of the Board, and (2) the existence of more than 6000 unresolved grievances in the unit. Plaintiff Gabauer contends that the Trusteeship was imposed because of his, Huskey's and others' opposition to the 1969 strike.
 
 
 7
 Following the appointment of an administrator, UAW representative Eugene Mattix, who had been appointed Deputy Administrator, advised Chevrolet Unit zone committeemen orally that no handbills were to be circulated among the Local 25 membership without his prior knowledge and approval. On June 16, 1970, Gabauer, Huskey and other committeemen passed out handbills to union members critical of the Trusteeship, an apparent violation of Mattix's censorship order. Gabauer was summarily removed from his position as Chairman of the Shop Committee by Mattix on June 22, 1970. Mattix testified that Gabauer's removal was due to (1) his continued refusal to negotiate a redistricting agreement with General Motors and (2) his refusal, as Chairman of the Shop Committee, to accept from General Motors certain termination of seniority reports on behalf of unit members. Huskey similarly was removed from his position as a committeeman by Mattix on June 24, 1970. Mattix testified that the reasons for Huskey's removal were (1) his continued refusal to negotiate and sign a redistricting agreement with General Motors and (2) Huskey's refusal to comply with Mattix's request that certain grievances be withdrawn.[4] Both plaintiffs were notified by letter immediately of the reasons for their removal from office.
 
 
 8
 In July of 1970, following imposition of the Trusteeship, the UAW undertook to audit the finances of Local 25 with respect to union funds paid to committee members for time lost from work on account of authorized union employment. When a trusteeship is imposed a general audit is routine practice. Defendant Mazey, as Secretary-Treasurer of the UAW and supervisor of union auditors, ordered a lost time audit as well as a general audit after learning from Mattix of complaints of alleged "double-dipping."[5] The audit revealed that Huskey, Gabauer and others may have wrongfully received amounts ranging from $159 (Huskey) and $74.69 (Gabauer) down to $5.80 (for a total of $319) for alleged "double-dipping." Five of the six found to have wrongfully received union funds were those committeemen who had opposed the 1969 strike and had passed out handbills in violation of Mattix's censorship order. On August 19, 1970, union auditor Berry made his final report to Mazey. On August 22, 1970, Mazey wrote Huskey and Gabauer a letter, the text of which reads:
 
 
 9
 A recent audit of the financial records of UAW Local 25 revealed possible overcharges of lost time that you received from the Local Union.
 
 
 10
 Attached is a summary of the lost time in question.
 
 
 11
 You will be given an opportunity to appear before representatives of the International Union on Thursday, August 27, 1970, to explain what appears to be an overcharge of lost time. You are requested to appear at the UAW Region 5 office, located at 130 South Bemiston Avenue, St. Louis, Missouri, at 2:00 P. M., in the office conference room.
 
 
 12
 Copies of the August 22nd letter were sent to Worley, Administrator and Regional Director of UAW; Irv Bluestone, Co-Director of the UAW's General Motors Department; Roy Hartzell, Financial Secretary of Local 25; Mattix, Deputy Administrator; and the auditor who conducted the audit. Similar letters were sent to other committeemen who were accused of "double-dipping." All such accused persons appeared and presented evidence at a hearing August 27, 1970, conducted by UAW's chief auditor Bateman. On September 1, 1970, Bateman wrote a report to Mazey detailing the results of the auditor's hearing. Mazey then forwarded written findings and recommendations to Woodcock. After a consideration of the record Woodcock wrote the following letter to Gabauer on September 15, 1970:
 
 
 13
 As a result of an audit by the International Union, it appears by convincing evidence that you are responsible for misappropriation of funds in the amount of $74.69.
 
 
 14
 You were given an opportunity at a hearing held on August 27, 1970, before John Bateman, Administrative Assistant to the Secretary-Treasurer; Joe Berry, International Auditor; Eugene Mattix, Region 5 Servicing Representative; and Roy Hartzell, Financial Secretary of Local 25, to explain alleged misappropriation of funds from Local 25. I have been advised by the office of the Secretary-Treasurer that your explanations were unsatisfactory and did not in any way change the finding of the Auditor that you had misappropriated funds from Local 25.
 
 
 15
 Therefore, be advised that you are summarily suspended; upon receipt of this letter, from any office or position you may now hold within the Local Union and you are further prohibited from seeking election to any office or position within the Local Union (elected or appointed), until you have made full restitution of the misappropriated funds claimed against you or such prohibition has been lifted by a two-thirds (2/3) vote of the International Executive Board.
 
 
 16
 This action is imposed upon you in accordance with the authority vested in my office under the provisions of Article 47, Section 5 of the International Constitution. You have the right, under this provision, to appeal your suspension within thirty (30) days.
 
 
 17
 You are hereby requested to make full restitution to Local 25 in the amount of $74.69 which you improperly received from the Local Union.
 
 
 18
 The above action is effective and binding upon you and the Local Union upon receipt of this letter.
 
 
 19
 A similar letter accusing Huskey of misappropriation of $159.04 was mailed to Huskey September 15th. Copies were mailed to the same persons who received copies of Mazey's August 22nd letter. On September 18, 1970, Woodcock wrote another letter to Huskey and Gabauer making a correction in the September 15th letter, the effect of which was to require both repayment and a two-thirds vote of the Executive Board before either could be restored to candidacy or elective office.
 
 
 20
 Gabauer and Huskey repaid the money as requested and appealed Woodcock's action to the Appeals Committee of the UAW Executive Board. The Appeals Committee absolved Gabauer completely from any wrongdoing in February of 1971.[6] Huskey, however, was found guilty of "double-dipping" on two of the five days he was so charged.[7] An appeal to the Public Review Board[8] by Huskey resulted in an affirmance of the Appeals Committee's decision.
 
 
 21
 Count I of Gabauer's complaint alleged violations of §§ 101(a)(1), 101(a)(2), 101(a)(5) and 609 of the Landrum-Griffin Act, 29 U.S.C. §§ 411(a)(1), 411(a) (2), 411(a)(5) and 529. Jurisdiction is asserted under § 102 of the Act, 29 U.S.C. § 412. Count II alleged common law libel by three letters: (1) Mazey's letter of August 22, 1970, to Gabauer; (2) Woodcock's letter of September 15, 1970, to Gabauer; and (3) Woodcock's letter of September 18, 1970, to Gabauer.
 
 
 22
 Finding no evidence from which the jury could find that plaintiff's rights under Title I of the Landrum-Griffin Act were violated, the trial court directed a verdict for all defendants on Count I. Defendants also received a directed verdict on Count II (libel) on the grounds (1) lack of publication of the allegedly libelous letters, (2) qualified privilege by those receiving the letters and (3) lack of evidence showing express or actual malice.
 
 
 23
 On appeal Gabauer contends the court erred in directing verdicts on both counts of the complaint because:
 
 
 24
 I. (a) Plaintiff's evidence, when viewed in the light most favorable to him, presented a prima facie case that defendants infringed his first amendment freedom of speech rights;
 
 
 25
 (b) The trial court erred in refusing to direct a verdict in favor of plaintiff on his due process claims under Count I.
 
 
 26
 II. There was sufficient evidence of publication and actual malice to submit the libel count to the jury.
 
 
 27
 COUNT I.
 
 
 28
 Before reaching the merits of the issues raised by plaintiff we must consider a jurisdictional question raised by defendants. Plaintiff has relied on 29 U.S.C. § 529 as a basis for jurisdiction over the union and its agents under Count I alleging violations of § 101(a)(2) of the Act (freedom of speech). 29 U.S.C. § 529 provides:
 
 
 29
 It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter. The provisions of section 412 of this title shall be applicable in the enforcement of this section.
 
 
 30
 Defendants contend that the right to hold office is protected under § 529 only if the punishment imposed includes loss of membership rights in the union. Gabauer was removed from his chairmanship of the Shop Committee position in June of 1970 and denied his candidacy rights by Woodcock's letter of September 15, 1970, but has never been suspended from membership in the local or national unions.
 
 
 31
 In Sheridan v. Carpenters Local 626, 306 F.2d 152, 156 (3d Cir. 1962) the Third Circuit held that 29 U.S.C. § 529 did not protect union officers from removal from office unless membership rights are denied the removed officer. This interpretation was reaffirmed in Martire v. Laborers' Local 1058, 410 F.2d 32, 35 (3d Cir. 1969). However, in International Ass'n of Machinists v. King, 335 F.2d 340 (9th Cir. 1964) the Ninth Circuit squarely held that the § 529 terms "otherwise discipline" includes removal from union office. The Seventh Circuit, sitting en banc, adopted the reasoning in King in Wood v. Dennis, 489 F.2d 849 (7th Cir. 1973). We agree with the majority opinion in Wood that the Ninth Circuit's analysis of the relevant legislative history is correct in concluding that § 609 of the Labor-Management Reporting and Disclosure Act provides a cause of action for wrongful removal from union office because of the exercise of rights granted union members in § 101(a)(2) of the Act. Accord, Schonfeld v. Penza, 477 F.2d 899 (2d Cir. 1973); Sewell v. International Ass'n of Machinists, 445 F.2d 545 (5th Cir. 1971).
 
 
 32
 Plaintiff contends that his removal from chairmanship of the Shop Committee June 22, 1970, and the subsequent restrictions on his eligibility for union office due to Woodcock's action of September 15th[9] were done in reprisal for his opposition to the 1969 strike and his subsequent handbilling critical of both the strike and the Trusteeship. Such reprisals would be a violation of the freedom of speech rights guaranteed union members in Title I, § 101(a)(2) of the Landrum-Griffin Act, 29 U.S.C. § 411(a)(2), and enforced through § 609, 29 U.S.C. § 529 which makes it unlawful to discipline a member for exercise of these statutory rights. Semancik v. District # 5, UMW, 466 F.2d 144, 153 (3d Cir. 1972); Sewell v. International Ass'n of Machinists, 445 F.2d 545, 550 (5th Cir. 1971). The defendants contend, however, that Gabauer was removed from office and subsequently denied candidacy for elected office solely because of his refusal as Chairman of the Shop Committee to negotiate a redistricting agreement with General Motors and refusal to accept certain notices of termination of seniority on behalf of Chevrolet Unit employees. Thus, if there is evidence to support both sides a question of fact is presented.
 
 
 33
 In considering the propriety of granting a directed verdict we view the evidence in the light most favorable to the party against whom the verdict is directed. Havenfield Corp. v. H & R Block, Inc., 509 F.2d 1263, 1269 (8th Cir. 1975). "A directed verdict is in order only where the evidence points all one way and is susceptible of no reasonable inferences sustaining the position of the nonmoving party." Giordano v. Lee, 434 F.2d 1227, 1231 (8th Cir. 1970). 'All of the facts which the plaintiff's evidence reasonably tends prove must be assumed to have been established, and all inferences fairly deductible from such facts much (sic) be drawn in his favor.' Greene v. Werven, 275 F.2d 134, 137 (8th Cir. 1960).
 
 
 34
 Regarding the reasons for directing a verdict in favor of defendants on Count I of the complaint the trial court stated:
 
 
 35
 The evidence discloses that plaintiff refused to abide by a directive of the Executive Board of the International Union, following which an administrator was appointed under prescribed union procedures. It was the administrator appointed to take charge of the local union who removed plaintiff from office because of his continued refusal to obey the directive. There is no evidence whatever from which the jury could reasonably find that the June 22, 1970 removal of plaintiff by the administrator from the office plaintiff held on June 22, 1970, was related in any way to plaintiff's opposition to the strike or was motivated by his having written defendant Woodcock the letter of April 1, 1969, well over a year prior thereto. The evidence is clear that the administrator would not have removed plaintiff had he complied with the directive.
 
 
 36
 Plaintiff's evidence is largely circumstantial. There is no doubt that the individual and union defendants through their agents were aware of plaintiff's opposition to the 1969 strike. Woodcock admitted that he received Gabauer's letter of April 1, 1969, opposing the strike. Woodcock's response encouraging cooperation was made orally by local UAW representatives at Woodcock's direction. Woodcock was aware that certain members of the opposing political faction had filed union charges against Gabauer because of his opposition to the strike[10] prior to imposition of the Trusteeship and Gabauer's subsequent removal from office. Plaintiff would have us believe, but the evidence does not show or infer, that Woodcock was instrumental in having the charges filed or at least knew about them at the time they were filed. There is evidence that Woodcock was aware that strong opposing political factions existed in Local 25 prior to and during the events in question.
 
 
 37
 Plaintiff points to the timing of certain occurrences as evidence to support a jury verdict on Count I. Jim Blancett, a member of the opposing political faction and a zone committeeman, was an announced candidate for Chairman of the Shop Committee (Gabauer's position) for the scheduled June 16 and 17, 1970, elections. On June 12, 1970, at the show cause hearing Blancett was allowed to introduce and read a "Green and White" handbill signed by Gabauer which was distributed prior to the March 1970 national delegate elections. Such handbill was critical of the 1969 strike. The Executive Board, who held the hearing, voted the same day to impose the Trusteeship. Gabauer's removal from office on June 22nd by Deputy Mattix occurred within a few days of Gabauer's violation of Mattix's allegedly illegal suppression order of June 16th. The audit of Local 25 committeemen (which led to charges of "double-dipping" against Gabauer) commenced on or about July 8, 1970, the same day that Gabauer and Huskey refused to accept a conditional offer of reinstatement from Irving Bluestone, a UAW official. After Gabauer was removed from office on June 22nd "Ace" Tirey, a political opponent and one of those who had filed charges against Gabauer following Gabauer's opposition letter of April 1, 1969, was appointed Chairman of the Shop Committee by the Administrator. Plaintiff argues that the described events are directly related to his removal from office and not simply coincidental.
 
 
 38
 We are convinced, after a thorough review of the record, that the trial court did not err in directing a verdict in favor of all defendants on the § 101(a) (2) (freedom of speech) aspect of Count I. Plaintiff's claim that the defendants violated plaintiff's § 101(a)(2) rights is entirely conclusory. The timing of the various incidents might well lead to a suspicion that defendants' motives were suspect but not an inference that defendants' actions were a violation of § 101(a)(2). We agree with the trial court that plaintiff's opposition to the April 1969 strike is too remote to allow a jury to speculate that it may have been the basis for plaintiff's removal from office well over a year later. There is no evidence that plaintiff's removal from office June 22nd was caused or precipitated by handbilling allegedly done in violation of Mattix's suppression order of June 16th. We find no credible evidence that Woodcock's removal letter of September 15, 1970, was induced by plaintiff's exercise of free speech, either before or after the Trusteeship was imposed. It is pure speculation to tie Gabauer's removal from office to the events herein described. There is insufficient probative evidence to support a jury verdict.
 
 
 39
 Count I of plaintiff's complaint contained an alleged violation of § 101(a) (5), 29 U.S.C. § 411(a)(5)[11] (due process) as well as § 101(a)(2), 29 U.S.C. § 411(a)(2) (freedom of speech) by defendants.
 
 
 40
 The first violation of plaintiff's due process rights allegedly occurred at the June 12, 1970, show cause hearing which resulted in imposition of the Trusteeship by the UAW. Plaintiff alleges due process violations consisting of (1) failure to afford cross-examination rights at the hearing; (2) lack of notice before the hearing both as to time or substance; and (3) lack of an appeals procedure to protest the action taken by the UAW. We start with the proposition that the imposition of a Trusteeship is presumed to be valid in the absence of "clear and convincing proof" that the Trusteeship was not established or maintained in good faith for allowable purposes.[12] 29 U.S.C. § 464(c). Plaintiff's evidence is insufficient to rebut such presumption. The evidence shows that UAW fully complied with the requirements of Article 12 § 3 of its own constitution, including the notice and hearing requirements, before imposing the Trusteeship on Local 25. See 29 U.S.C. § 462.
 
 
 41
 Plaintiff contends his § 101(a)(5) due process rights were violated by Deputy Administrator Mattix's summary removal of him on June 22, 1970, from office. However, the cases are virtually unanimous that § 101(a)(5) does not apply to removal or suspension, even when done summarily, from union office unless union membership rights are denied.[13] Martire v. Laborers' Local 1058, 410 F.2d 32, 35 (3d Cir. 1968); International Ass'n of Machinists v. King, 335 F.2d 340, 342-43 (9th Cir. 1964); Airline Stewards v. Transport Workers, 334 F.2d 805, 808-09 (7th Cir. 1964). We are in agreement with the cited cases.
 
 
 42
 Plaintiff's final due process claim presents a slightly different situation. His contention is that the August 27, 1970, hearing which resulted in the suspension from candidacy for union office on September 15 was conducted in violation of the due process rights guaranteed in § 101(a)(5). The circuit courts of appeal which have considered the question have held that rendering a man ineligible from union office affects him as a member, and allows a court challenge to the procedures which result in such discipline. Schonfeld v. Penza, 477 F.2d 899, 904 (2d Cir. 1973); Martire v. Laborers' Local 1058, 410 F.2d 32, 35 (3rd Cir. 1968). We find it unnecessary to decide whether denial of candidacy from union office creates a cause of action under § 101(a)(5) because even assuming that it does, plaintiff's evidence on denial of due process at the August 27th hearing is insufficient as a matter of law to submit it to the jury. On August 22, 1970, Gabauer was notified that "possible overcharges" may have been received by him and that an opportunity would be afforded him August 27, 1970, to explain. Despite Gabauer's contentions to the contrary, the record shows that Gabauer did attend the August 27th hearing and was allowed to explain the prima facie evidence of "double-dipping."[14] A detailed schedule of alleged violations accompanied the August 22nd notice. John Bateman, the head of UAW's auditing department, presided at the hearing. Huskey attended this hearing as did other zone committeemen. Gabauer's appearance at the hearing consumed one hour and forty-nine minutes. A prima facie case of "double-dipping" was made out against Gabauer at this hearing. Gabauer's contention that Bateman, who conducted the audit, was also his accuser is without merit. It was the UAW, acting through its president, which made the accusations. We are satisfied that plaintiff was afforded due process in connection with the August 27, 1970, hearing. A jury question was not generated by plaintiff.
 
 
 43
 We have viewed plaintiff's evidence in the light most favorable to him. The evidence is insufficient as a matter of law to sustain a jury verdict in his favor. There was no error in directing a verdict in favor of all defendants on Count I.
 
 
 44
 COUNT II.
 
 
 45
 The trial court directed a verdict at the close of all the evidence in favor of all defendants on Count II of plaintiff's complaint. As a basis for directing a verdict on Count II, Judge Regan found (1) that communications in question were at least qualifiedly privileged and that there was insufficient evidence to support a finding of actual malice needed to overcome privilege, and (2) the legal element of publication was absent.
 
 
 46
 On appeal plaintiff argues that there was actual publication of the letters in question and that there was sufficient evidence of actual malice to overcome the qualified privilege, if it exists.
 
 
 47
 When diversity of citizenship is the basis for jurisdiction in a federal court, that court will apply the law of the state where the cause arose. Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1936). The trial court applied Missouri law and the parties do not challenge its application on appeal. We agree with the trial court that the controlling Missouri law on libel actions of this type is found in Pulliam v. Bond, 406 S.W.2d 635 (Mo.1966). Pulliam was a union official who had differences with other officials of the union. A statement charging Pulliam with financial misconduct (including "double-dipping") was prepared, signed and filed by a majority of the Executive Committee of the union of which Pulliam was a member. Copies of these charges were sent to the Secretary-Treasurer of the union Board and to Pulliam. There was evidence that Pulliam presented a copy of the charges to members of his local union. Pulliam then filed a libel complaint against the Chairman of the Board, Bond, in the state court. A jury returned a verdict in favor of plaintiff Pulliam after the trial court overruled defendant's motions for a directed verdict. On appeal the Missouri Supreme Court reversed the trial court, holding that a verdict should have been directed in defendant's favor. The court stated:It seems to be generally recognized that a qualified privilege attaches to statements and communications made in connection with the various activities of such organizations as . . . labor unions . . . . Thus, it is well settled that members of such bodies may . . . prefer charges against fellow members . . . and make proper publication of any disciplinary action that may be taken, without liability for any resultant defamation so long as they act without malice. (Citations omitted). The . . . manner in which the charges were preferred were within the framework of the organization. The trial court correctly held that the communication in question was entitled to the protection of a qualified or conditional privilege. (Citations omitted).
 
 
 48
 By accepting membership in the (union), the plaintiff must be held to have consented to be subjected to having written charges filed against him and to have such charges processed in the manner provided by the constitution and bylaws of the organization and by applicable statutes. (406 S.W.2d at 641).
 
 
 49
 In the instant case copies of the allegedly libelous letters were mailed only to officials of either the local or national union.
 
 
 50
 Assuming without deciding that the letters in question were both false and defamatory, the publications are not necessarily actionable. A communication in Missouri is qualifiedly made in good faith upon any subject matter in which the person making the communication has an interest or in reference to which he has a duty, and to a person having a corresponding interest or duty. Estes v. Lawton-Byrne-Bruner Ins. Agency Co., 437 S.W.2d 685, 690 (St. Louis Ct.App.1969). The recipients of the three letters, as officers of the union involved, certainly had the requisite interest in and, in the case of Worley, Mattix and Auditor Bateman, a duty to implement the directives maintained in the letters. Just as in Pulliam v. Bond, supra, the plaintiff consented to be subjected to having such charges processed according to local by-laws and those of the national union by accepting membership in the union. There is no evidence that the charges against plaintiff were processed other than by guidelines found in the UAW Constitution.
 
 
 51
 There is evidence that persons other than those who received the allegedly libelous letters eventually learned of their contents. There is no evidence, however, that any of the defendants were responsible for such publication. There is evidence that plaintiff himself is responsible for the excessive publication. Defendants are not legally responsible for such unauthorized publication. Pulliam v. Bond, supra, at 643.
 
 
 52
 We think that the persons who received the allegedly libelous publications were qualifiedly privileged to receive those communications. In the absence of evidence of malice, there was thus no actionable publication of the letters.
 
 
 53
 Once a qualified privilege is found[15] a plaintiff may still recover if he presents substantial evidence that the defendant has acted outside the privilege. This may be done by showing that a publication was done with actual or express malice. Pulliam v. Bond, supra at 641. Although the question of the existence of actual malice is for the jury, if there is no substantial evidence to support a finding of malice, the court should direct a verdict. Estes v. Lawton-Byrne-Bruner Ins. Agency Co., 437 S.W.2d 685, 691 (St. Louis App.Ct.1969). The finding that a qualified privilege exists " precludes an inference of malice from the communication of false and defamatory matter and the plaintiff has the burden of proving express malice." Pulliam v. Bond, supra at 641. In Missouri "actual malice" means "with knowledge that it was false or with reckless disregard of whether it was false or not." Woolbright v. Sun Communications, Inc., 480 S.W.2d 864, 867 (Mo.1972). See New York Times v. Sullivan, 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). We think plaintiff's evidence clearly fails to meet this burden. Although Gabauer was later exonerated of any wrongdoing, the evidence shows that a prima facie case of "double-dipping" was revealed by the audit. Mazey's letter of August 22nd merely informed Gabauer of the nature of the charges and where and when he would have an opportunity to be heard. Woodcock's letters of September 15th and 18th were sent in accordance with and the requirements of Article 48 § 5 of the UAW Constitution.[16] There is no substantial evidence that the letters were sent "with knowledge of their falsity or with reckless disregard of whether they were true or false." Woolbright v. Sun Communications, supra, at 868.
 
 
 54
 Finding (1) that a qualified privilege exists and (2) that there is no substantial evidence of actual malice, we conclude that there was no error in directing a verdict in favor of defendants on Count II of plaintiff's complaint.
 
 
 55
 In view of our disposition of both counts of plaintiff's complaint, we find it unnecessary to consider other assignments of error made by the parties.
 
 
 56
 The court properly sustained defendants' motion for directed verdict on Counts I and II of the complaint. The judgment dismissing the complaint is affirmed.
 
 
 
 *
 Honorable Warren L. Jones, Senior U. S. Circuit Judge, Fifth Circuit, sitting by designation
 
 
 [1]
 There is some controversy as to whether such intervention destroyed diversity jurisdiction on Count II of plaintiff's complaint. In view of our disposition of Count II we find it unnecessary to decide the issue
 
 
 [2]
 The Honorable John K. Regan, District Judge, Eastern District of Missouri. The court's decision is reported at Gabauer v. Woodcock, 87 L.R.R.M. 3035 (E.D.Mo.1974)
 
 
 [3]
 The Shop Committee was composed of seven zone committeemen, one of whom was Chairman. In addition there were some 23 district committeemen in Local 25 each representing smaller constituencies. The terms "zone" and "shop" are used interchangeably to describe members of the Shop Committee. The zone committeemen, along with officers of the local, make up the governing Executive Board of Local 25
 
 
 [4]
 The grievances followed the removal of Gabauer from office by Deputy Administrator Mattix on June 22 or 23, 1970. The grievances protested the fact that General Motors would not accept appointments Gabauer was attempting to make in the Shop Committee after the Trusteeship had been imposed
 On August 24, 1970, some two months after Gabauer and Huskey were removed from office, a redistricting agreement was negotiated by the Administrator and ratified by the members.
 
 
 [5]
 "Double-dipping" is charging the local union for the same hours for which pay is received from the employer
 
 
 [6]
 Because of the delay from time of removal from the union offices, to the time of the Appeals Committee's decision in February 1971, both Huskey and Gabauer were denied their delegate credentials for the October 1970 national UAW convention and the right to be candidates for committeemen positions in December 1970, when the postponed local elections were finally held. The Trusteeship was continued by action of the UAW Executive Board September 2, 1970, and not terminated until November 18, 1971
 
 
 [7]
 In regard to the two days for which Huskey was found guilty of "double-dipping" the evidence shows Huskey was working at the union hall writing strike benefit checks. Huskey claimed and received from the union $54.86 for each of the two days, June 19 and 20, 1969, for time lost from work at General Motors. Huskey's General Motors time cards for the two days show that he was pencilled in for work on one day and clocked in on the other day. It is undisputed that Huskey was not at work in the plant on the two days in question. Thus, Huskey received pay from both the union and General Motors for the two days in question. Huskey's explanation, which the Appeals Board apparently did not believe, was that either a company foreman checked him in for "paragraph 21" pay or that someone else tampered with his time card without his knowledge. "Paragraph 21" pay is compensation due an employee for previous hours worked for which the employee has not been paid
 
 
 [8]
 The Public Review Board is a body of seven nonunion members which serves as an appellate review body under the UAW Constitution
 
 
 [9]
 Although Woodcock's letter of September 15, 1970, informed plaintiff he was being removed from any offices he then held, defendants point out in their Answer and Brief that Gabauer had already been removed from his Chairmanship of the Shop Committee position in June 1970 by the Administrator. Thus the only effect of the September 15th letter was to deny Gabauer his status as a delegate to the national UAW convention and deny his candidacy for the local elections in December of 1970
 
 
 [10]
 Gabauer was ultimately found innocent of the charges in August of 1969 following a six day trial. Gabauer then filed charges against those who accused him. Trial on these charges was postponed by the Administrator after the Trusteeship was imposed and apparently were unresolved at the time of this trial
 
 
 [11]
 29 U.S.C. § 411(a)(5) provides:
 No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) offered a full and fair hearing.
 
 
 [12]
 See 29 U.S.C. § 462 for purposes for which a trusteeship may be established
 
 
 [13]
 Sections 101(a)(5) and 609 of the Landrum-Griffin Act, 29 U.S.C. §§ 411(a)(5), 529, both contain the phrase "otherwise discipline." We have decided supra that § 609 provides a cause of action for wrongful removal from office without loss of membership. The legislative history of § 101(a)(5) is such that the majority of courts have concluded that the cited phrase in § 101(a)(5) is not coextensive with § 609 in regard to the necessity of loss of union membership. See International Ass'n of Machinists v. King, 335 F.2d 340, 344-45 (9th Cir. 1964)
 
 
 [14]
 Plaintiff received a transcript of the hearing proceedings as a result of pre-trial discovery activity
 
 
 [15]
 The determination of whether a qualified privilege exists is a question for the court and not a jury. Hellesen v. Knaus Truck Lines, Inc., 370 S.W.2d 341, 345 (Mo.1963)
 
 
 [16]
 Article 48 § 5 of the UAW Constitution provides for summary removal from office of any local official who, as a result of an audit, appears to be guilty of misappropriation of funds by "convincing evidence."