Garland WILSON, Jr. and Jane Wilson, Appellees,

v.

UNITED STATES of America, Appellant.

AMERICAN NATIONAL BANK OF ST. JOSEPH, a National Banking Association, Executor of Estate of Elmore Y. Lingle, Deceased, and Florence A. Lingle, Appellees,

v.

UNITED STATES of America, Appellant.

Nos. 74–1937, 74–1938.

United States Court of Appeals, Eighth Circuit.

Submitted May 12, 1975.

Decided Feb. 11, 1976.

Rehearing and Rehearing En Banc Denied March 4, 1976.

Lay, Circuit Judge, concurred and filed opinion.

Joseph M. McManus, Tax Div., Dept. of Justice, Washington, D. C., Bert C. Hurn, U. S. Atty., Kansas City, Mo., Scott P. Crampton and Gilbert E. Andrews, Appellate Sec., Tax Div., U. S. Dept. of Justice, and Jonathan S. Cohen, Tax Div., Dept. of Justice, Washington, D. C., for appellant.

Joseph A. Hoskins, Walter J. Kennedy, Kansas City, Mo., for appellees.

Before LAY, ROSS and WEBSTER, Circuit Judges.

WEBSTER, Circuit Judge.

Following a deficiency determination by the Commissioner of Internal Revenue resulting from the exercise of his reallocation of income powers, taxpayers brought a tax refund suit in the District Court. The government appeals from an adverse judgment.

Before giving a more detailed recitation of the facts in evidence which otherwise may seem complex and confusing, it may be helpful to present in capsule form the genesis of the dispute and the government's contentions on appeal.

In 1964, taxpayers formed a corporation to provide consulting services in connection with the establishment of a new meat packing plant in Sterling, Colorado. Compensation was to be based upon a percentage of the profits of the plant. The service corporation paid taxpayers only a small portion of the compensation received. Taxpayers subsequently transferred their stock to members of their families. The Commissioner determined that the income paid to the service corporation had actually been earned by the taxpayers and reallocated such income, which resulted in tax deficiencies in 1968 and 1969.

The government contends that the District Court erred in directing a verdict for taxpayers on the Commissioner's allocation under Section 482 of the Internal Revenue Code of 1954 and in refusing a directed verdict for the government on the issue of assignment of income under Section 61 of the Code.

We now examine the facts in more detail.

Taxpayers Garland Wilson and Elmore Lingle[1] were, during the period of the events previously summarized, the president and chairman of the board respectively of Seitz Packing Company of St. Joseph, Missouri. In 1962, Seitz purchased cattle from John Leibsek, a cattle feeder in Sterling, Colorado. Later that

---

1. Jane Wilson and Florence Lingle are parties to this appeal solely by virtue of their having signed joint federal income tax returns with their respective husbands for the years in issue. American National Bank of St. Joseph was substituted as a party upon Elmore Lingle's death. Garland Wilson and Elmore Lingle will hereinafter be referred to as "taxpayers" for purposes of convenience.

year, Leibsek and Bill Seckler contacted Wilson and Lingle concerning the possibility of establishing a meat packing house in Sterling. Lingle traveled to Colorado to study the area, but nothing developed from that visit.

In the spring of 1964, Wilson and Lingle were contacted by Seckler and another cattle feeder, Edward Sonnenberg, neither of whom were knowledgeable about the meat packing industry. They sought the taxpayers' advice and assistance in establishing a packing house. Wilson and Lingle traveled to Colorado to meet with a group of cattle feeders. The two men, with the assistance of Mr. McGlumphy, a Seitz vice-president, then conducted an all-encompassing feasibility study. Sometime during that period, an arrangement to pay these three Seitz officials was set up. It provided:

> *Management Fee.* Twenty per cent of the profit of the plant before taxes will be paid to the Wilson, McGlumphy and Lingle interest as a management fee. This is for the work of planning the operation, laying out the plant, training the people in Sterling as employees, setting up the systems and controls and developing the markets. Certain key people will be brought from the Seitz Packing Company to be the resident manager of the new plant and to take charge of various departments.

The feasibility study and negotiations between the parties continued for several months until a decision was made to carry out the project under a corporation to be named Sterling Colorado Beef Company. Sterling was incorporated in October, 1964.

Wilson, Lingle, and McGlumphy decided to incorporate their own consulting functions in order to avoid the risks of liability inherent in operating on an individual or partnership basis, and, on November 5, 1964, Packers Advisory Company was incorporated. Shortly thereafter, Packers elected to be taxed as a Subchapter S corporation. As of December 31, 1964, Wilson and Lingle each

owned 120 shares of the Packers stock and McGlumphy owned the remaining 60 shares.

On February 9, 1965, Packers and Sterling entered into a contract providing for contingent compensation payments to Packers based on a percentage of Sterling's net profits in return for advice by Packers to Sterling.[2] The contract specifically provided that it was to be construed solely as an agreement between Sterling and Packers and was not to be taken as requiring the individual services of any particular officer or employee of Packers. Sterling retained the right to cancel the agreement if Packers failed to provide "qualified, experienced, competent and capable personnel"; it was stipulated that present and future officers, directors, and employees recruited from Seitz met these requirements as long as Seitz remained an independent packer.

A period of considerable efforts to establish Sterling as a viable operation followed. Wilson made three or four trips to Colorado in the summer of 1965 and moved there in September, 1965, remaining until May, 1966. Lingle remained in St. Joseph managing Seitz, but continued to help set up Sterling. McGlumphy devoted his time in the Sterling area to procuring high quality cattle for the packing house. Packers also secured the services of several other Seitz employees as they were needed. Sterling was not an immediate success, but by 1968 its problems had been largely worked out. As the company became established, the need for Wilson and Lingle's services diminished.

During the years from 1964 to 1967, taxpayers received no compensation from Packers in payment for their services to Sterling because Sterling earned no profit. In both 1968 and 1969, they each received a $6,000 "consulting fee" from Packers for their efforts. During these same two years, Sterling paid Packers a total of $233,000 ($113,000 in 1968 and $120,000 in 1969).

2. The contract was for a period of twenty-five years, and compensation was to be a stated percentage of pre-tax profits starting at 20% and diminishing to 10% over the term.

In January, 1967, Wilson gave 110 of his 120 shares of Packers stock to his children—55 to each child—and Lingle did likewise. Later in 1967, McGlumphy disposed of his 60 shares; Wilson and Lingle each thereafter acquired 10 additional shares, leaving each with a total of 20 shares. In February, 1968, Wilson and Lingle each transferred 18 of their shares to their children and the remaining 2 shares to a third party, thereby terminating their ownership interests in Packers. Wilson and Lingle remained as the directors and officers of Packers and continued to vote the stock through proxies given by their children.

The Commissioner determined that Wilson and Lingle had each received compensation from Packers in the amounts of $41,953.38 in 1968 and $44,937.62 in 1969 in excess of the $6,000 which each had reported on their federal income tax returns.

Following payment of the deficiency, the taxpayers brought this action to obtain a refund pursuant to 26 U.S.C. § 7422. At trial, the government defended the assessments on four grounds: (1) Section 482 of the Internal Revenue Code[3] empowered the Commissioner to make such a reallocation between two commonly owned trades or businesses in order to properly reflect income as it was earned; (2) Section 1375(c) of the Code[4] supported the Commissioner's action since it requires apportionment of income among shareholders who are members of the same family in order to properly reflect the value of services rendered to a Subchapter S corporation; (3) Section 61 of the Code[5] and the "assignment of income" doctrine developed under that section justified the determination since Wilson and Lingle had assigned income they earned to Packers; and (4) Packers was a sham corporation having no legitimate business purpose and should be disregarded as an entity for tax purposes.

At the conclusion of the taxpayers' case, the District Court denied the government's motion for a directed verdict on the Section 482, Section 61, and sham corporation issues. At the close of all the evidence, the taxpayers moved for a directed verdict on all four issues. The District Court granted taxpayers' motion on the Section 482 issue, holding that there were not two or more trades or businesses under the taxpayers' common control as is required by the statute. The court also granted a directed verdict on the Section 1375(c) issue since at the time that the first income was paid from Sterling to Packers the taxpayers were not shareholders in Packers. The court refused to grant a directed verdict on the sham corporation issue and instructed the jury that the sole issue for it to decide was whether Packers was a sham corporation; it thereby precluded consideration of the assignment of income issue on any other grounds. There was no express ruling on, or submission to the jury of, the Section 61 issue. The jury returned a verdict in favor of Wilson and Lingle on the sham corporation issue.[6] The District Court thereafter denied the government's motion for judgment notwithstanding the verdict and for new trial.

I

*Section 482 Issue*

Section 482 of the Internal Revenue Code provides:

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among

---

**3.** 26 U.S.C. § 482.

**4.** 26 U.S.C. § 1375(c).

**5.** 26 U.S.C. § 61.

**6.** The government does not challenge this finding on appeal. The government likewise does not appeal on its claim that the Commission-

er's action was supported by Section 1375(c) since it concedes that at the time the first income was paid from Sterling to Packers the taxpayers were not shareholders in Packers and that the section thus is inapplicable.

such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

■ In cases involving reallocation of income under Section 482, it has been held that the Commissioner's determination to reallocate income is not to be overturned in an action in the district court for a refund of income taxes unless that determination is shown by the taxpayer to have been unreasonable, arbitrary, and capricious. *Liberty Loan Corp. v. United States*, 498 F.2d 225, 229 (8th Cir.), *cert. denied*, 419 U.S. 1089, 95 S.Ct. 680, 42 L.Ed.2d 681 (1974); *Baldwin-Lima-Hamilton Corp. v. United States*, 435 F.2d 182, 185 (7th Cir. 1970); *Aiken Drive-In Theatre Corp. v. United States*, 281 F.2d 7, 10 (4th Cir. 1960); *Young & Rubicam, Inc. v. United States*, 410 F.2d 1233, 1244–45, 187 Ct.Cl. 635 (1969). Because the Commissioner has broad discretion to appraise the factual situation, the issue to be submitted to the trier of the fact is whether or not the Commissioner's determination under Section 482 was arbitrary and capricious.[7] The government contends that it was error to take this issue from the jury by directing a verdict thereon in favor of taxpayers.

■ The standard to be applied in ruling on a motion for a directed verdict has been set out by this Court on many occasions. In *Gabauer v. Woodcock*, 520 F.2d 1084, 1091 (8th Cir. 1975), we said:

In considering the propriety of granting a directed verdict we view the evidence in the light most favorable to the party against whom the verdict is directed. *Havenfield Corp. v. H & R Block, Inc.*, 509 F.2d 1263, 1269 (8th Cir. 1975). "A directed verdict is in order only where the evi-

---

7. Research has disclosed only one reported case in which a tax refund suit challenging a Section 482 allocation has heretofore been submitted to a jury. In *Brentwood Homes, Inc. v. United States*, 240 F.Supp. 378, 380 (E.D.N.C.1965), *aff'd sub nom., J. R. Land Co. v. United States*, 361 F.2d 607 (4th Cir. 1966), the district court apparently submitted to the jury the issue of "whether the Commissioner acted arbitrarily, capriciously and unreasonably in determining that the income" should be reallocated under Section 482.

The burden of persuasion is upon the taxpayer. The ultimate determination to be made is whether the action of the Commissioner was unreasonable, arbitrary, and capricious. Since a tax refund suit is neither a trial de novo nor a judicial review of an administrative record, the task of making that determination falls upon the trier of the fact, in much the same way that "negligence" must be determined as a question of fact after consideration of the evidentiary facts presented. *See McAllister v. United States*, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); *In re Flowers*, 526 F.2d 242, 244 (8th Cir. 1975); *Chicago & N.W. Ry. v. Minnesota Transfer Ry.*, 371 F.2d 129, 131 (8th Cir. 1967); *Lewis v. Super Valu Stores, Inc.*, 364 F.2d 555, 556 (8th Cir. 1966). *See generally* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2590 (1971).

To assure proper guidance of the jury, we think the District Court should make use of special interrogatories and instruct the jury with respect to such findings. *See* Fed.R. Civ.P. 49. In this case, the Commissioner im-

plicitly found that there were two or more businesses owned or controlled by the same interests. Thus, the jury should be asked to determine separately (1) whether the Commissioner could reasonably have found that the activities of the taxpayers in connection with Sterling Colorado Beef Company constituted a business or enterprise separate and distinct from Packers Advisory Company, and (2) if so, whether the Commissioner could reasonably have found that such business or enterprise and Packers Advisory Company were owned or controlled directly or indirectly by the same interests. The jury should be instructed that if either interrogatory is answered in the negative, then it may find that the action of the Commissioner was arbitrary and capricious and return a verdict in favor of the taxpayers on this issue. We equate reasonableness with the antithesis of that which is arbitrary and capricious. *See United States v. Carmack*, 329 U.S. 230, 243, 67 S.Ct. 252, 91 L.Ed. 209 (1946); *Dooley v. Highway Truckdrivers and Helpers, Local 107*, 192 F.Supp. 198, 200 (D.Del.1961); 6 C.J.S. Arbitrariness (1975). The jury should be guided in its consideration of these three findings by instructions appropriate to the law of the case. Thus, in answering the first interrogatory, the jury could be instructed that it was entitled to consider (1) whether the Sterling group sought solely the services of the taxpayers rather than the services of the corporation in general, and (2) whether the taxpayers rather than the corporation actually performed the services.

dence points *all one way* and is susceptible of *no* reasonable inferences sustaining the position of the nonmoving party." *Giordano v. Lee,* 434 F.2d 1227, 1231 (8th Cir. 1970). (emphasis original)

*Accord, Decker-Ruhl Ford Sales, Inc. v. Ford Motor Credit Co.,* 523 F.2d 833, 836 (8th Cir. 1975). A directed verdict in favor of the party carrying the burden of proof is proper only in an exceptional case. *Powers v. Continental Casualty Co.,* 301 F.2d 386, 388 (8th Cir. 1962). *See also* 5A J. Moore, Federal Practice ¶ 50.02[1], at 2318–19 (2d ed. 1975). Thus, only if it can be fairly concluded from the record that the Commissioner's determination was arbitrary and capricious as a matter of law would the taxpayers be entitled as plaintiffs to a directed verdict in their favor.

 In order to justify a reallocation under Section 482, the Commissioner must find (1) that there are two or more trades, businesses, or organizations, (2) that such enterprises are owned or controlled by the same interests, and (3) that the reallocation is necessary to allocate income among the two or more enterprises in order to prevent evasion of taxes or to properly reflect each enterprise's income. *B. Forman Co. v. Commissioner of Internal Revenue,* 453 F.2d 1144, 1152 (2d Cir.), *cert. denied,* 407 U.S. 934, 92 S.Ct. 2458, 32 L.Ed.2d 817 (1972). Proof of tax avoidance motives on the part of the taxpayer is not required to invoke application of the section. *Philipp Bros. Chemicals, Inc. v. Commissioner of Internal Revenue,* 435 F.2d 53, 57 n. 4 (2d Cir. 1970). In making reallocations under the section, the standard to be applied is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. *Baldwin-Lima-Hamilton Corp. v. United States, supra,* 435 F.2d at 185.

The District Court said in granting a directed verdict on this issue:

It is the view of the Court that there are not two or more organizations, trades or businesses involved in this case, that the activities of Wilson and Lingle in carrying out their advisory activities under the terms of the contract were carried on as officers of the corporation and not as individuals or as trade or business and, therefore, it does not come within the provisions of Section 482 * * *.

The issue before the District Court was not whether there were two or more businesses, but whether, on the evidence adduced, the Commissioner's determination was arbitrary and capricious. Only if the factual issues were undisputed or so clearly established that the issue of arbitrariness and capriciousness could be established as a matter of law would the District Court have been justified in directing a verdict.

The legislative history of Section 482 indicates that the terms "trade", "business", and "organization" are to be construed broadly. *See* H.R.Rep.No.704, 73d Cong., 2d Sess., 24 (1934). The regulations promulgated by the Commissioner also defined the terms broadly to cover practically any type of entity or enterprise which has independent tax significance. *See* Treas. Reg. §§ 1.482–1(a)(1) and (2) (1968). A review of the cases dealing with the Commissioner's determination that two or more enterprises exist indicates that the following factors, *inter alia,* are given weight: (1) whether the third party desiring the services sought solely the services of the taxpayers or sought the services of the corporation in general, *see Rubin v. Commissioner of Internal Revenue,* 460 F.2d 1216, 1218 (2d Cir. 1972); and (2) whether the taxpayers alone or the corporation (taxpayers and other corporate employees) actually performed the services, *see Borge v. Commissioner of Internal Revenue,* 405 F.2d 673, 676 (2d Cir. 1968), *cert. denied,* 395 U.S. 933, 89 S.Ct. 1994, 23 L.Ed.2d 448 (1969).

 Reviewing the record in this case in the light most favorable to the government, we must conclude that there was sufficient evidence of two or more trades or businesses to warrant submitting to the jury the issue of the arbitrariness of the Commissioner's determination under Section 482. Initially, the cattle feeders in Sterling, once hav-

ing become acquainted with the taxpayers, sought out the individual services of the taxpayers. The original compensation arrangement was between Sterling and the taxpayers as individuals. The subsequent contract between Packers and Sterling can be construed as providing for services by Wilson and Lingle, despite language in the contract to the contrary, since Sterling had a "veto" power over Packers' choice of the individuals who would perform the services. Despite the fact that some of the services were provided by Packers as a corporation, these services were contemplated in the original management fee arrangement between the individuals and Sterling. Thus, Packers assisted the taxpayers in no other way than was already contemplated. Packers, although incorporated in 1964, did not pay taxpayers any compensation at all until 1968 and did not establish formal salaries for them until 1970. This evidence supports an inference that the two men were not true employees of Packers since employees do not generally work without compensation. There was also evidence that Packers initially paid the taxpayers a lump sum "consultant fee" as if they were an independent enterprise.

There was thus sufficient evidence on the record to require the arbitrariness of the Commissioner's determination to be submitted to the jury; the District Court therefore erred in granting taxpayers' motion for a directed verdict.[8]

## II

### Section 61 Issue

The District Court limited the jury's consideration of that part of the Commissioner's determination which necessarily relied upon Section 61 to establish liability for assigned income attributable to the stock transfers. The jury was instructed that the sole issue before it was whether Packers was a sham corporation. The jury found that Packers was not such a corporation, and, since the government does not challenge this finding, it is the law of the case.

The District Court apparently viewed this jury finding to be conclusive on the Section 61 assignment of income issue. However, a finding that a corporation is not a sham does not preclude reallocation under the assignment of income doctrine. A finding that a corporation is a sham merely allows the Commissioner to disregard the corporation altogether for tax purposes. *Haberman Farms, Inc. v. United States*, 305 F.2d 787 (8th Cir. 1962); *James Realty Co. v. United States*, 280 F.2d 394 (8th Cir. 1960). It is still possible that a taxpayer could assign receipt of income he earned to a viable corporation in an attempt to avoid the tax liability for that income. This would violate the general principle that income is taxable to the person who earns it. *See United States v. Basye*, 410 U.S. 441, 449–50, 93 S.Ct. 1080, 35 L.Ed.2d 412 (1973); *Helvering v. Horst*, 311 U.S. 112, 119, 61 S.Ct. 144, 85 L.Ed. 75 (1940); *Lucas v. Earl*, 281 U.S. 111, 114–15, 50 S.Ct. 241, 74 L.Ed. 731 (1930). Section 61(a) provides, in part, that "gross income means all income from whatever source derived, including * * (1) Compensation for services, including fees, commissions, and similar items * * *." The assignment of income doctrine, which has developed under this section, holds that compensation for services is an item of gross income which cannot be effectively assigned to escape

8. For the same reasons, we reject the government's additional contention that it was entitled to a directed verdict on this issue since the evidence supporting the Commissioner's determination does not show it to have not been arbitrary and capricious as a matter of law.

We also reject appellees' contention that the District Court's decision should be upheld, even if it was incorrect on the "trade or business" ground, on the alternative theory that the evidence showed that the annual payments to the taxpayers constituted reasonable arm's length compensation. The testimony was that the $6,000 paid for 1968 and 1969 was reasonable compensation for the work done in 1968 and 1969 alone. This testimony ignored the substantial amount of work done from 1964 to 1967 by taxpayers. The government contends that the Commissioner applied Section 482 in this case to cover the entire period. It is for the jury to determine whether the allocation made by the Commissioner was, in the light of all the evidence, arbitrary and capricious.

the burden of taxation. *See Lucas v. Earl, supra*, 281 U.S. at 114–15, 50 S.Ct. at 241. In *United States v. Basye, supra*, 410 U.S. at 449–50, 93 S.Ct. at 1086, the Supreme Court said:

> The entity earning the income * * * cannot avoid taxation by entering into a contractual arrangement whereby that income is diverted to some other person or entity. Such arrangements, known to the tax law as "anticipatory assignments of income," have frequently been held ineffective as means of avoiding tax liability. * * *
>
> * * * * * *
>
> The principle of *Lucas v. Earl*, that he who earns income may not avoid taxation through anticipatory arrangements no matter how clever or subtle, has been repeatedly invoked by this Court and stands today as a cornerstone of our graduated income tax system.

[11] The question, then, on the government's assignment of income theory under Section 61 was not whether Packers was a sham corporation but whether the taxpayers had earned the income and assigned it to Packers. These were factual issues, and the evidence in this case was sufficient to require their submission to the jury. While this was not a case in which the taxpayers originally received the income and then assigned the right to receive future payments, and while there was no express assignment of income or of the right to receive income,[9] there was evidence that the taxpayers originally had the right to receive payments for their services.

In concluding that these issues were not submitted to the jury under proper instructions, we express no opinion on whether there had in fact been an assignment of income. We likewise reject the government's contention that a directed verdict or judgment notwithstanding the verdict should have been entered in its favor. Upon retrial the District Court should permit consideration of the assignment of income by taxpayers in a manner not restricted to the test of whether Packers was a sham corporation.[10]

The judgment of the District Court is reversed and remanded for further proceedings consistent with this opinion.

LAY, Circuit Judge (concurring).

Granting a directed verdict for the taxpayer on these facts was improper under § 482. I concur in the result reached by the majority.

However, I do not agree that the question of abuse of discretion by the Commissioner in reallocating income under § 482 is for the jury. The Commissioner's decision under § 482 is not to be disturbed unless the taxpayer demonstrates it is "unreasonable, arbitrary or capricious."[1] Whether the Commissioner's discretion has been properly exercised is, in my view, an ultimate question of law for the court.

The majority's attempt to equate the Commissioner's abuse of discretion in terms of unreasonableness with a jury's finding of lack of reasonable care in a negligence case confuses what is properly a question of law with a question of fact. Reasonableness under negligence standards falls within the peculiar competence of a lay jury simply because the standard of due care is that of the reasonable person acting under similar circumstances. This is a nontechnical question of human conduct. *See United States v. Kaiser*, 363 U.S. 299, 304–05, 80 S.Ct. 1204, 4 L.Ed.2d 1233 (1960). How-

---

9. In *Fontaine Fox*, 37 B.T.A. 271, 277–78 (1938), the fact that there had been no express assignment was accorded weight.

10. Since the government in this appeal does not contest the "no sham" finding, that finding is the law of the case and may not be raised again upon retrial.

1. "Abuse of discretion", "unreasonable" and "arbitrary and capricious" are treated as dif-
ferent methods of stating the same standard under § 482. *See Liberty Loan Corp. v. United States*, 498 F.2d 225, 229 (8th Cir.), *cert. denied*, 419 U.S. 1089, 95 S.Ct. 680, 42 L.Ed.2d 681 (1974); *Pauline W. Ach*, 42 T.C. 114, 125–26 (1964), *aff'd*, 358 F.2d 342 (6th Cir.), *cert. denied*, 385 U.S. 899, 87 S.Ct. 205, 17 L.Ed.2d 131 (1966).

ever, whether the Commissioner's allocation under § 482 is reasonable is a far different question. The jury has no special expertise or competence to guide them in this determination. The non-technical definition of the reasonable person is alien to this determination.

Under § 482, many intricate factual and legal factors are called into play. More importantly, under § 482, in granting broad discretion to the Secretary of the Treasury and his delegate, the Commissioner, Congress obviously relied on the expertise of the Commissioner to determine whether and to what extent reallocation is necessary to clearly reflect income when enterprises are subject to common control. This explicit grant of discretion differentiates § 482 cases from other tax suits in which the Commissioner's determinations merely carry a presumption of validity, as in the question of whether a purported business expense is "reasonable and necessary" or whether an employer's payment is a gift or compensation for services rendered. *Cf. Commissioner of Internal Revenue v. Duberstein*, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); Ferguson, *Jurisdictional Problems in Federal Tax Controversies*, 48 Iowa L.Rev. 312, 341–44 (1963). Where, on the other hand, Congress has expressly granted discretion to give scope to administrative expertise it surely did not intend that expertise to be nullified through substitution of the jury's judgment for that of the Commissioner. This is the effect of the majority opinion.

The jury may have a limited role in § 482 cases. I agree with the majority that the jury may decide whether the factual prerequisites to a § 482 reallocation are present. Thus, with proper instructions, a jury could be permitted to decide: (1) whether there were two or more businesses; and (2) whether the businesses were subject to the same con-

trol. The taxpayer has the burden of proving that one or both of these prerequisites to reallocation did not exist.

Once these factual issues have been resolved, however, the court must determine their legal effect. If the taxpayer has successfully proved that one or both of the prerequisites was absent, then the court should enter judgment in the taxpayer's favor for the reason that the Commissioner had no power to reallocate at all. If, on the other hand, the jury finds the prerequisites present, then the court should decide whether the Commissioner has abused his discretion (1) in deciding that some reallocation was necessary to clearly reflect income or to prevent evasion of taxes; or (2) in making a particular reallocation. The Commissioner need only arrive at a reasonable approximation of the income result of arm's length dealing under the circumstances.[2] If he has done so, the Commissioner's finding is not arbitrary,[3] and must be sustained even if the court, were it deciding the question in the first instance, might have acted differently.

The right of trial by jury in tax cases is not governed by the Seventh Amendment. *Wickwire v. Reinecke*, 275 U.S. 101, 105–06, 48 S.Ct. 43, 72 L.Ed. 184 (1927). The right to a jury trial on factual questions in refund suits was originally recognized by implication from a statutory reference to suits at law. *Id.* Today, the statutory grant is explicit in tax refund cases under 28 U.S.C. § 2402, enacted in 1954 as an amendment to the Tucker Act, 28 U.S.C. § 1346.[4] Where Congress gave specific discretion to the Commissioner as under § 482, it logically follows that his determination was not intended to be nullified by jury review.

---

**2.** *See Liberty Loan Corp. v. United States*, 498 F.2d 225, 229 (8th Cir. 1974); *B. Forman Co. v. Commissioner of Internal Revenue*, 453 F.2d 1144, 1157 (2nd Cir.), *cert. denied*, 407 U.S. 934, 92 S.Ct. 2458, 32 L.Ed.2d 817 (1972).

**3.** Any jury verdict to the contrary would have to be set aside under a judgment notwith-

standing the verdict. *See Brentwood Homes, Inc. v. United States*, 240 F.Supp. 378 (E.D.N.C.1965), *aff'd sub nom., J. R. Land Co. v. United States*, 361 F.2d 607 (4th Cir. 1966).

**4.** Act of July 30, 1954, ch. 648, § 2(a); 68 Stat. 589.