Efrain MACEIRA et al., Plaintiffs,

v.

Luis Enrique PAGAN et al., Defendants.

Civ. No. 80–1029.

United States District Court,
D. Puerto Rico.

Aug. 19, 1980.

Ellis Boal, Detroit, Mich., for plaintiffs.

Alejandro Torres Rivera, Torres & Velaz, Río Piedras, P. R., for defendants.

## DECISION AND ORDER

TORRUELLA, District Judge.

In this action Plaintiffs [1] seek injunctive relief and damages against Defendants [2]

---

1. Plaintiffs are Efrain Maceira, an employee of Hotel La Concha and the former local general steward of the Hotel Condado Beach–Hotel La Concha–Convention Center employees, and various other employees of that employer. Mr.

Maceira will hereinafter be referred to as "Plaintiff Maceira" and the other Plaintiffs as "Plaintiff Employees."

pursuant to the so–called Bill of Rights provisions of the Labor–Management Reporting and Disclosure Act of 1959, 29 U.S.C. §§ 401 et seq. (more specifically 29 U.S.C. §§ 411(a)(1), 411(a)(2), 412, 501(a) and 529). Plaintiffs claim a right to reinstatement of Plaintiff Maceira to his position as local general steward and further seek to enjoin Defendants "to cease infringing or denying member's rights to speak, write, assemble, or organize regarding union matters ... and ... disciplining any member for excercise (sic) of these rights."

Upon issuance of an Order to Show Cause, a hearing was held on July 11, 1980 to determine whether a preliminary injunction was proper. At the hearing both testimonial and documentary evidence was presented to the Court, whereupon we make the following:

## FINDINGS OF FACT

1. Local 901 is the bargaining agent for the employees of the Hotel Condado Beach–Hotel La Concha–Convention Center bargaining unit in San Juan, Puerto Rico.[3]

2. Defendant Pagán is the Secretary–Treasurer of Local 901 and its chief executive officer.

3. Plaintiff Maceira is and has been a member in good standing of Local 901 since February, 1977, and has been an employee of the La Concha unit throughout said period of time and at present.

4. Plaintiff Employees are also members in good standing of Local 901 and employees of the bargaining unit.

5. On or about April, 1979 Plaintiff Maceira was elected local general steward of the employees of the bargaining unit.

6. Article XXIX of the Constitution and By–Laws of Local 901 (Exhibit A), in substance makes the steward[4] responsible for the internal administration of the bargaining unit, including the handling of grievances at a preliminary stage. Intervention at a more formal level is the responsibility of the business representatives (Section 6.39) or higher authority (Section 6.03). Although elected by the membership, stewards may be "removed in such manner as the Executive Board may determine" (Section 19.08), which we deem to mean, for cause.[5]

7. Plaintiff Maceira, with the exception of the instances hereinafter noted, performed his duties as a steward in an adequate manner.

8. Plaintiff Maceira engaged in various activities which can generally be described as directed against the leadership of Local 901, and more particularly, against Defendant Pagán. These included, among others, joining and participating in a group called "TALC",[6] seeking the support of the steward's council for the general dissemination of the by–laws of Local 901, and opposing a mandatory disaster fund fee to be assessed against the membership.

---

2. Local 901 (I.B.T.C.W. & H), hereinafter called "Local 901" and its chief executive officers, Luis Enrique Pagán, hereinafter called "Defendant Pagán."

3. As a matter of law, Local 901 is a labor organization within the meaning of 29 U.S.C. § 402(i).

4. This document uses the term "shop steward" which we find to be the equivalent of "local general steward."

5. Stewards may also be removed by the membership (Article XXIX(A)).

6. "TALC" is an acronym for "Tronquistas A la Carga", which in turn means, "Teamsters, Charge!" This is a somewhat loose entity which cloaks itself as a reform movement of the Teamster organization, but which, because of its principally non–membership composition is probably a rival labor organization in embryo. This group, through August–December, 1979, published a series of virulent anti–Defendant Pagán leaflets (Exhibits B, C, and D). Considering that the evidence is presently unclear as to whether the activities of Plaintiff Maceira with TALC constitute the promotion of a rival labor organization, or whether they fall within free speech protection of 29 U.S.C. § 411(a)(2), we will assume for purposes of this suit that they are the latter. Cf. *Sheridan v. Liquor Salesmen's Union, Local 2, DRW*, 303 F.Supp. 999 (S.D.N.Y., 1969).

9. Plaintiff Maceira was also highly and publicly critical of Defendants' handling of an arbitration case involving the discharge of a La Concha bartender, Angel Martínez. Plaintiff Maceira advised Martínez to sue the Union and otherwise surreptitiously aided and promoted Martínez in other actions directed at Local 901. Martínez finally did not follow Plaintiff Maceira's advice, and with Local 901's aid, is presently seeking the setting aside of the award against him.

10. On November 22, 1979, Plaintiff Maceira wrote the Secretary of Labor of Puerto Rico claiming violations by the bargaining unit employers of the Christmas Bonus Law (29 LPRA 501 et seq.) and asking that an investigation be conducted of the books of said employers. Thereafter, on November 30, 1979, Plaintiff Maceira issued a written press release, and held a press conference, regarding these matters, which received wide circulation in the local press. These actions are outside of Plaintiff Maceira's scope of duties as steward and Defendants did not authorize the same.

11. At approximately this same time Plaintiff Maceira held another press conference in support of a strike then in effect by the employees of the Caribe Hilton Hotel, who are represented by a rival labor organization. This conference was covered by the local and national news media. These actions by Plaintiff Maceira were also *ultra vires*. Plaintiff Maceira also cooperated with the Caribe Hilton picket line, but it is not clear whether this was done in an individual or an official capacity.

12. On December 7, 1979 Defendant Pagán called a meeting of all stewards, which was to be held at the Sheraton Hotel. The purpose of the meeting was a Christmas party and no official business was to be conducted. Plaintiff Maceira arrived before the meeting formally started intending to discuss various union matters. He forcefully attempted to close down the bar and to address the delegates. After the meeting was formally opened he was given the opportunity to talk to the assembly, but they voted against his proposal to the effect that serious union business be discussed. Various insults were exchanged between Plaintiff Maceira and Defendant Pagán, and thereafter, Plaintiff Maceira walked out of the gathering with various followers, and the party continued.

13. On December 21, 1979, Defendant Pagán wrote Plaintiff Maceira informing him of his removal as steward in that he did not "represent the best interests of the Union." Defendant Pagán cited Plaintiff Maceira's activities *as delegate* in dealing with the Martínez case, in holding the Christmas bonus press conference, and during the Christmas party, as examples of this conduct. Defendant Pagán's action was later ratified by Local 901's board of directors at its January 11, 1980 meeting.

14. Plaintiff Maceira has filed an administrative appeal pursuant to Local 901's internal procedures, which is presently pending before the International's General Executive Board.[7]

## CONCLUSIONS OF LAW

Among other things, the allegations of the parties bring into focus "the fine line which must be drawn between what might be termed insubordination on the one hand and freedom of speech on the other",[8] when dealing with the actions of a union official who is also a member of the labor organization in which he is an official.

There is no question but that the Labor-Management Reporting and Disclosure Act of 1959, supra, gives members of labor organizations the right of free speech and assembly *vis-a-vis* their labor organizations and the officialdom thereof.[9] Furthermore,

---

**7.** International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

**8.** *Wood v. Dennis*, 489 F.2d 849, 855–856 (C.A.7, 1973), cert. den. 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974); also quoted in *Newman v. Local 1101, Communications Workers*, 597 F.2d 833, 836 (C.A.2, 1979).

**9.** 29 U.S.C. § 411(a)(2) states:
"Freedom of Speech and Assembly. Every member of any labor organization shall have the right to meet and assemble freely with

the rights thereby created are enforceable by an action in this Court.[10]

■ The free speech rights created by this Statute are far–reaching and even include what amounts to a license by members to engage in libel against union officials concerning union affairs. *Salzhandler v. Capute*, 316 F.2d 445 (C.A.2, 1963), cert. den. 375 U.S. 946, 84 S.Ct. 344, 11 L.Ed.2d 275 (1963); *Keeffe Brothers v. Teamsters, Local 592*, 562 F.2d 298, 304 (C.A.4, 1977); *Semancik v. UMW, District 5*, 466 F.2d 144 (C.A.3, 1972); *Fulton Lodge No. 2 v. Nin*, 415 F.2d 212 (C.A.5, 1969), cert. den. 406 U.S. 946, 92 S.Ct. 2044, 32 L.Ed.2d 332 (1972).

There is however, a clear distinction between what a union member can say and do as a member, and his statements and actions when acting in the capacity of a union representative or official. Although union members do not lose their free speech rights by accepting official responsibilities and duties within the union,[11] the ball does not stop there. As the court said in *Sewell v. Grand Lodge of Int. Ass'n. of Mach. & Aero. Wkrs.*, 445 F.2d 545 (C.A.5, 1971), cert. den. 404 U.S. 1024, 92 S.Ct. 674, 30 L.Ed.2d 674 (1972), at pages 550–552:

> other members; and to express any views, arguments, or opinions, and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, that nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations."
>
> 29 U.S.C. § 529 provides that:
> "It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representation of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this Act. The provisions of Section 102 shall be applicable in the enforcement of this Section."

" . . . This conclusion, however, does not permit an employee who accepts employment for the performance of certain specified duties to take the largesse and pay of the union, on the one hand, and, on the other, to completely subvert the purposes of his employment by engaging in activities diametrically opposed to the performance of his specified duties. As Judge Bell observed in *Airline Maintenance Lodge 702, etc. v. Loudermilk:* [444 F.2d 719 (C.A.5, 1971)]

The rights of a union member under this statute must be balanced against the right preserved to the union to make rules as to the responsibility of the member toward the union as an institution. And this balancing process must rest on the facts.

To permit an individual to accept union employment, to receive union pay, and to enjoy the prestige of a union position, while spending his employer's time opposing the plans and policies he was employed to execute, would in our judgment, be unreasonable. All employees, whether they work for a union or a large commercial company, may be required at times to subordinate personal expression to the responsibilities of their employment. An essential and elemental ingre-

10. 29 U.S.C. § 412 reads as follows:
"Any person whose rights secured by the provisions of this title have been infringed by any violation of this title may bring a civil action in a district court of the United States for such relief (including injunctions), as may be appropriate..."
This Court has jurisdiction over the present controversy by virtue of this statute.

11. See *Newman v. Local 1101, Communication Workers*, supra; *Bradford v. Local 1093, Textile Workers of America*, 563 F.2d 1138 (C.A.4, 1977); *Miller v. Holden*, 535 F.2d 912, (C.A.5, 1976); *Cooke v. Orange Belt District Council of Painters*, 529 F.2d 815 (C.A.9, 1976); *Gabauer v. Woodcock*, 520 F.2d 1084, 1091 (C.A.8, 1975), cert. den. 423 U.S. 1061, 96 S.Ct. 800, 46 L.Ed.2d 653 (1976); *Wood v. Dennis*, 489 F.2d 849, 857 (C.A.7, 1973), cert. den. 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974); *International Assn. of Machinist v. King*, 335 F.2d 340 (C.A.9, 1964), cert. den. 379 U.S. 920, 85 S.Ct. 274, 13 L.Ed.2d 334 (1964).

dient of all employment is basic loyalty by employees to the employer in performing the duties of the job for which they were hired. If a conflict of interest arises between an individual's desire to oppose the plans and policies of his employer and the discharge of the duties of the position in which he is employed, fundamental considerations of fair play would require him to remove himself from such a position.

To hold that a union has no right to discharge an employee for insubordination under the facts of this case would, we believe, seriously detract from effective, cohesive union leadership. The result might well be weak, ineffective and fragmented unions which would be paralyzed in bargaining for the rights and welfare of union members against the monolithic front of large commercial corporations in the modern commercial world. For this very reason it has long been the philosophy of collective bargaining and other vital union activities that the union representing the employees should be able to bargain on equal terms with employers whose economic interests are often diametrically opposed." (Citations generally omitted).

Apropos, another court stated in *Newman v. Local 1101, Communications Workers*, 570 F.2d 439, 445 (C.A.2, 1978):

" . . . [A] union official or employee . . . has certain duties toward the organization he represents and its leadership, which usually (as in this case) has been elected by the members according to democratic procedures, and has been entrusted with the responsibility for supervision of the union's affairs, including the formulation of policies, plans and programs believed to be in the best interests of the membership. . . . Although a person is free as a union member to criticize mercilessly his union's management and its policies, once he accepts a union position obligating him fairly to explain or carry out the union's policies or programs, he may not engage in conduct inconsistent with these duties without risking removal as an official or employee (but not

as a union member) on the ground that his conduct precludes his effective representation of the union. Unless the management of a union, like that of any other going enterprise, could command a reasonable degree of loyalty and support from its representatives, it could not effectively function very long. To obligate union leadership to tolerate open defiance of, or disagreement with, its plans by those responsible for carrying them out, would be to invite disaster for the union.

In this tension between conflicting rights and duties of the union and its agents the balance to be struck depends on whether the union representative's exercise of his free speech rights may reasonably be viewed as impairing his ability to function effectively as a representative of the union's management. If so, the union may remove him, provided he remains free as a member openly to criticize the union's leadership and its policies without reprisal. We do not believe that Congress intended Title I of LMRDA to insulate union officials, employees, or agents from removal, or to permit a union representative who disagrees with its leadership to freeze himself in office on First Amendment grounds.

The inquiry in each case, therefore, must be to determine whether a member's opposition to the union's programs or policies may be reasonably viewed as precluding him from acting effectively as its representative, and whether his removal from his official position would tend to prevent him or others from exercising their rights as members under Title I of LMRDA. The inquiry requires a close analysis of the nature of the union position in question, the extent of the allegedly unlawful discipline, and the motivation behind the removal. As Judge Oakes pointed out in *Schonfeld*, supra; [*Schonfeld v. Penza*, 477 F.2d 899 (C.A.2, 1973)]:

'We by no means suggest . . . that the free speech rights of union members are

threatened or infringed upon every time a political dispute occurs in a union and the dissident members interpret some action by union officials as a threat.'

Only where there is clear and convincing proof that the union action–in this case the decertification of Newman as a job steward–was 'part of a purposeful and deliberate attempt by union officials to suppress dissent within the union', 477 F.2d 904, should the federal court act under LMRDA. Otherwise we are bound to adhere to our longstanding policy against intervention in the internal affairs of unions, which are best 'left to the officials chosen by the members to manage those operations except in the very limited instances expressly provided by the Act'." (Citations generally omitted).

In our opinion, the trend of Plaintiff Maceira's action *in his official capacity* clearly transcends protected free speech and suggest an incursion by him into the area of insubordination and *ultra vires* activity. Plaintiffs' evidence far from being "clear and convincing proof that the union action was part of a purposeful and deliberate attempt by union officials to suppress dissent within the union", in our view shows an attempt to manage the union by those who in law and fact are responsible for its management. As previously indicated, Plaintiff Maceira's actions in several matters were outside the scope of his authority as steward. It was not only the right, but also the duty, of Defendant Pagán to take action against him to prevent his seriously compromising the union.

We should at this point emphasize that Plaintiff Maceira remains a member in good standing of Local 901 and that his employment at La Concha has not in anyway been affected. Furthermore, his duties have been taken over by the former assistant steward who, speculative evidence excepted, is carrying out these functions in a normal and effective manner.

These factors are of importance because it leads us to an inquiry regarding whether Plaintiffs have a cause of action pursuant to the provisions of the statute in question,

and additionally, whether they have complied with traditional equity principles for the issuance of preliminary injunctive relief. To our mind the answer to both questions is in the negative.

█ The Statute in question protects the union–member relationship not the union–officer relationship. *Martire v. Laborers' Local Union 1058*, 410 F.2d 32 (C.A.3, 1969), cert. den. 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179 (1969); *Sheridan v. United Brotherhood of Carpenters*, 306 F.2d 152 (C.A.3, 1962); *Réos v. Oil, Chemical and Atomic*, 331 F.Supp. 511 (D.C.P.R., 1970); *Coulon v. Teamsters, Chauffeurs, Workmen, etc.*, 409 F.Supp. 1165 (D.Mass., 1976). The *Sheridan* case properly analyzes this issue, and summarizes the legislative history adequately. The Court there states (at 306 F.2d 156–157):

Plaintiff claims that he was exercising a right protected by Section 101(a)(4) when he had Burke prosecuted, and that Union disciplined him in violation of Section 609 by removing him from office for his having exercised this right. Union does not controvert the proposition that Section 101(a)(4) protects plaintiff's right to institute criminal proceedings against Burke. Our inquiry on this score is therefore narrowed to the question whether the removal of plaintiff from office was a form of 'discipline' as that term is used in Section 609. As earlier noted, the Section declares it unlawful for a labor organization to 'fine, suspend, expel, or otherwise discipline any of its members' for exercising a right protected by the Act. The word 'discipline' is not defined in the statute. This term appears to have been selected as a catchall to cover various sanctions other than 'fine, suspension, and expulsion'. But to say that a word is a catchall does not 'define what it catches'.

The language of the Section affords no support for the view that the term 'discipline' encompasses removal from office. The three disciplinary sanctions that are specifically enumerated in that section–fine, suspension, and expulsion–manifest

an intention by Congress to protect members *qua* members. Removal from office, on the other hand, is a sanction that can be directed only against the limited group of members who happen to be officers. We see no violation of Section 609 in plaintiff's removal from his office. Neither does Section 101(a)(4), the right–to–sue provision, support plaintiff's claim that the Act protects his status as an officer. Section 101(a)(4) is part of Title I of the Act. This title, captioned 'Bill of Rights of Members of Labor Organizations', and particularly Section 101, are designed to protect the rights of union members. The rights are repeatedly described as the right of 'any member' or 'every member'. No mention is made of rights of union officers or employees. It is of particular interest to note that the right–to–sue provision of the bill that was originally passed by the Senate provided that a labor organization shall not limit 'the right of any member *or officer* thereof to institute an action in any court ....' (emphasis added). The corresponding provision of the bill that was subsequently passed by the House did not contain the word officer. In commenting on this difference between the Senate and House bills, a document prepared by Senator Goldwater's staff and inserted at his request in the Congressional Record states that 'the Senate bill extends protection of the right to sue expressly to union officers.' 105 Cong.Rec. 16487 (1959). The Conference Committee adopted the House version, and accordingly Section 101(a)(4) as finally enacted by Congress speaks only of the right of *members*, thus conforming to the terminology used in the other provisions of Section 101.

"To be contrasted with the Title I rights are the provisions in Title IV relating to union elections. There, in dealing with candidacy for union office, the statute refers to the 'right of any candidate', the right of 'every bona fide candidate', and the obligations of a union to 'any bona fide candidate.' Thus when Congress wanted to grant protection to a specific category of union members, appropriate language was used in the statute.

Several district court cases, although distinguishable on their facts from the case at bar, also support the view that plaintiff's status as business agent is not protected by the Act. *Strauss v. International Brotherhood of Teamsters*, 179 F.Supp. 297 (E.D.Pa.1959), was a case involving a union employee who had been discharged from his position as business agent. In denying reinstatement, Judge Clary there stated:

'...... [Title I] deals with the *union– member* relationship and in no way supports jurisdiction of a suit involving the *employer* (union)–*employee* (business agent) relationship which is the essence of the present suit. Such a case turns more properly on the common law of employment contracts, or employment 'status' as a property right, matters which are outside the scope of Title I.' 179 F.Supp. at 300.

In *Jackson v. Martin Co.*, 180 F.Supp. 475 (D.Md., 1960), where an elected union committeeman who had been removed from his position by the union's executive board sought to be restored to, Chief Judge Thomsen denied relief, stating:

'... Title I of the Act ... deals with the union member relationship, not with the union officer or union–employee relationship.' 180 F.Supp. at 480.

Thus, neither under the 'Bill of Rights' provisions of Title I, nor under Section 609, proscribing disciplinary sanctions against union members, is plaintiff's status as business agent protected by the Act. It is the union–member relationship, not the union–officer or union–employee relationship, that is protected." (Emphasis in the original; citations generally omitted).

■ Plaintiffs fare no better as regards their allegations of voting rights violations, as this Statute protects direct rather than indirect, electoral rights. *Wood v. Dennis*, supra at 856–857. Their contentions re-

garding 29 U.S.C. § 501(a),[12] contained in the Second Cause of Action of the Complaint, stand on equal footing. *Lux v. Blackman*, 546 F.2d 713, 717–718 (C.A.7, 1976); *Nelme v. United Assn. of Journeymen & App.*, 405 F.2d 715, 717 (C.A.5, 1968).

Finally, we come to Plaintiffs' failure to meet the requisites for the issuance of a preliminary injunction.

■ This Court,[13] following traditional equity principles, has held that in considering whether a preliminary injunction should issue, the following factors must be considered by the Court:

(1) Whether irreparable harm will be suffered by plaintiffs if the relief is not granted;

(2) The extent to which the opposing party may be inconvenienced or damaged by issuance of such relief;

(3) The existence of adequate legal remedies; and

(4) The likelihood of petitioners prevailing when the suit is tried on the merits.

Although the curtailment of free speech, in a *constitutional* setting, has been considered to trigger irreparable injury sufficient to meet this preliminary injunction requirement,[14] we know of no case in the context of the present controversy which so rules. This, of course, is relevant only where Plaintiffs prove a free speech violation, which in this case they have failed to do. In contrast, in *Coulon v. Teamsters, Chauffeurs, Workmen, etc.*, supra, a case decided within this Circuit, Chief Judge Caffrey ruled upon many of the questions presently before us, including the lack of irreparable injury, in a manner contrary to Plaintiffs' position. It is worthy of note that the *Coulon* case also involves an officer removal situation.

■ Under the facts before us, there is even less possibility of irreparable harm in that Plaintiff Maceira remains a member and an employee. Furthermore, the assistant shop steward has taken over his functions and is performing them in an adequate manner. Plaintiffs have thus failed to meet the irreparable injury requirement. See also *Rueckert v. Sheet Metal Workers Int.'l Assn.*, 439 F.Supp. 479 (S.D.N.Y., 1977); *Broomer v. Schultz*, 239 F.Supp. 699 (D.C.Pa., 1965), aff. 356 F.2d 984 (C.A.3, 1966); *Rothstein v. Manuti*, 235 F.Supp. 48 (S.D.N.Y., 1964); *Vars v. Int'l. Bro. of Boilermakers, etc.*, 204 F.Supp. 241 (D.Conn., 1962).

Without the need for further detailed analysis, it is apparent from this decision that the Court does not believe that Plaintiffs will prevail on the merits of this controversy, thus falling short on at least one other requisite for the issuance of the requested remedy.

Considering the above, the Motion for issuance of a preliminary injunction is hereby DENIED. This matter is referred to the United States Magistrate for such action as will effectuate its speedy and efficient disposition.

IT IS SO ORDERED.

12. 29 U.S.C. § 501(a), provides:

"The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is therefore the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and by-laws and any resolutions of the governing bodies adopted thereunder to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization."

13. *Betteroads Asphalt Corp. v. Federación de Camioneros*, 391 F.Supp. 1035, 1039 (D.P.R., 1975); see also *Pauls v. Sec. of Air Force*, 457 F.2d 294 (C.A.1, 1972).

14. Cf. *Keefe v. Geonakos*, 418 F.2d 359 (C.A.1, 1969).