**Efrain MACEIRA et al., Plaintiffs, Appellants,**

v.

**Luis Enrique PAGAN et al., Defendants, Appellees.**

**No. 80–1622.**

United States Court of Appeals, First Circuit.

Argued Feb. 3, 1981.

Decided May 13, 1981.

Ellis Boal, Detroit, Mich., with whom Alejandro Torres Rivera, San Juan, P. R., and Torres & Velaz, Rio Piedras, P. R., were on brief, for plaintiffs, appellants.

Agustin Collazo Mojica, Rio Piedras, P. R., with whom Primitivo Pagan Colon, Santurce, P. R., was on brief, for defendants, appellees.

James Reif, and Gladstein, Reif & Seigel, Brooklyn, N. Y., on brief, for Richard Santiago, et al., amici curiae.

Before CAMPBELL, BOWNES and BREYER, Circuit Judges.

BREYER, Circuit Judge.

Plaintiffs, members of Local 901 of the International Brotherhood of Teamsters, sued the Local and its Secretary-Treasurer Luis Pagan. They claimed that, in removing plaintiff Efrain Maceira from his position as a union steward, Pagan and the Local violated their rights to free expression protected by the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"), popularly known as the Landrum-Griffin Act, 29 U.S.C. § 411(a)(2). They further alleged that this removal constituted "discipline" proscribed by 29 U.S.C. § 529.[1] Plaintiffs sought a preliminary injunction reinstating Maceira pending trial of their claim. The district court, 501 F.Supp. 641, after a hearing[2] denied their request. Plaintiffs appeal from this denial of a preliminary injunction. We reverse the district court.

I.

In April 1979 Maceira was elected a general steward of one of the many bargaining units that Local 901 represents. His particular unit covered employees of the Hotel Condado Beach, the Hotel La Concha, and the Convention Center, all in San Juan, Puerto Rico. As general steward he helped to process grievances, he kept union records, and he maintained continuous contact

---

1. Plaintiffs also alleged violations of voting rights, 29 U.S.C. § 411(a)(1), and of fiduciary duty, 29 U.S.C. § 501(a). Given our holdings here, we need not now reach these other claims.

2. The district court stated that the hearing was not meant to be "a full-scale trial" on the merits, but was to be "very skeletal." Plaintiffs Maceira, Jimenez and Nieves, defendant Pagan and union member Martinez testified at the hearing.

with the 600 members of his unit and the 20 ordinary unit stewards elected by various of the unit's departments. He, together with other stewards, made up a Stewards' Council, which advised the Local's leadership. But, under the union's rules, it was explicitly stated that a steward was neither an officer nor an agent of the union.

The record suggests that Maceira was an effective steward and an active union member and that many of his activities created tension between him and Local officials, such as Pagan. For example, he led efforts to have the collective bargaining contract and union by-laws translated into Spanish and distributed to members. He sought monthly steward meetings. He led a fight against a disaster relief plan that Pagan had proposed. He held a press conference to urge Local support of a strike by employees of the Caribe Hilton Hotel. And, he supported an organization called "Tronquistas A La Carga" ("TALC"), which saw itself as a "union reform" movement opposed to Pagan and other Local 901 officials.[3]

On December 11, 1979, Pagan dismissed Maceira as general steward. Pagan did so by writing, not to Maceira, but to Maceira's employer informing him of the dismissal. Within two days 300 union members signed a petition asking Pagan for a statement of reasons for the dismissal, and on December 14, 1979 Maceira also wrote to Pagan asking for an explanation. Pagan responded on December 21 with the following letter:

December 21, 1979

Mr. Efrain Maceira
62 SE Street # 1227
Reparto Metropolitano
Rio Piedras, PR 00921

Mr. Maceira:

The Labor Relations Law makes the Secretary-Treasurer and the Union itself, responsible for the acts of its delegates.

This is so because the law includes the delegates as agents of the Union. This being so, it is my duty as Secretary-Treasurer to see to it that the delegates be true representatives of the Union.

Your actions as agent of the Union leave much to be desired. On October 31, 1979 I met with all La Concha delegates and, among other things, discussed the case of co-worker Angel Martinez. The decision, and what was being done about it, was widely discussed. We solicited questions if there was any doubt. Everyone acquiesced, no one suggested anything. Nonetheless, in the meeting of November 1st, you presented yourself as the great defendor of Martinez and presenting defamatory criticism against the Union, when the previous day you maintained absolute silence.

Later on, you presented yourself at a press conference as a representative of the workers, claiming that they were not being paid the Christmas Bonus. This is incorrect on your part since the Teamsters Union is the only representative of said workers and when the time comes it will present the complaint with respect to the bonus.

As if this was not enough, during the assembly-party of December 7, 1979, you had the lack of respect and consideration towards the delegates and the Union Board that, without the program having started, you took the microphone on your own account to insult and incite those present to abandon the site, and even though you were not fruitful, it shows that you respond to interests foreign to the Union.

For all of which and because it is understood that, you do not represent the best interest of the Union I can not afford the luxury of having an agent

**3.** Maceira contends that his removal from his steward post was in reprisal for his association with TALC. Defendants stated in their answer to plaintiffs' complaint that Maceira's reinstatement to the position of general steward would cause them serious damage because he had aligned himself with TALC. In his affidavit, plaintiff Nieves stated that Pagan had told a meeting on December 19, 1979 that Maceira was a member of TALC and could not be trusted. Plaintiff Rivera similarly stated in an affidavit that on March 31, 1979, Pagan told a group of people that Maceira was a member of the "dissidents" and that it was necessary to "watch out" for him.

against the Union. I had no other choice than to destitute you as delegate.

Respectfully,

Luis E. Pagan

Secretary Treasurer

LEP/gg

fc: Membership-Condado Beach—La Concha Hotels & Convention Center

Maceira, who retained his union membership, proceeded to contest his dismissal from his shop steward post in accordance with the union's internal procedures. He filed charges with the Local. The Local's Board of Directors, without a hearing, dismissed the charges, and its president wrote to Maceira that he "did not answer to the best interests of the union". Maceira then appealed to the Teamsters' General Executive Board. The Board has not yet acted on the appeal, but the Teamsters' Constitution and by-laws provide that after four months pass without a final decision, union remedies are deemed to have been exhausted.

Finally, Maceira brought this court action. His basic claim is that, in dismissing him, Pagan violated the "free speech" clause of the bill of rights that the LMRDA enacted for the benefit of union members.[4] That clause, in relevant part, provides:

Every member of any labor organization shall have the right ... to express any views, arguments or opinions; and to express at meetings of the labor organization his views ... upon any business properly before the meeting ....

29 U.S.C. § 411(a)(2). This right of each member, however, is expressly made subject to the organization's right

to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution ....

*Id.*[5]

In refusing Maceira preliminary injunctive relief, the district court first concluded that the LMRDA's "free speech" clause does not protect an elected shop steward from the loss of his steward's position. The court noted that a later section of the LMRDA, 29 U.S.C. § 529, forbids "any labor organization ... to fine, suspend, expel, or *otherwise discipline* " (emphasis added) any member for exercising a right protected by the Act (such as "free speech"). The court, however, followed those cases that held that removal of a union official from his official position does not constitute "discipline" within the terms of this section. The court went on to hold that, in any event, Maceira's action transcends "free speech" and suggests "insubordination and *ultra vires* activity". Thus, the court ruled, plaintiffs did not show sufficient likelihood of success on their "free speech" claim or show sufficiently "irreparable" injury to warrant a preliminary injunction.

## II.

The prevailing view of the courts of appeal—which we share—is that the LMRDA allows an elected union official to assert a claim, in an appropriate case,

---

4. *See generally* Cox, *Internal Affairs of Labor Unions Under the Labor Reform Act of 1959*, 58 Mich.L.Rev. 819 (1960); Rothman, *Legislative History of the "Bill of Rights" for Union Members*, 45 Minn.L.Rev. 199 (1960).

5. As initially passed by the Senate, the freedom of speech section introduced by Senator McClellan was absolute in form, preventing "interference of any kind" by a labor organization with the expression of its members. *See* 105 Cong.Rec. 5810, 5827 (1959). Subsequently, Senator Kuchel introduced a substitute containing the "reasonable rules" language. *Id.* at 5997. Senator Cooper stated that the substitute removed "the extremes" but did not limit or derogate rights set forth in the original section. *Id.* at 6025. Senator Goldwater ex-

pressed concern that the "reasonable rules" language would preserve the union's right through its by-laws and constitution to limit members' rights to dissent and criticize the union. *Id.* at 6026–27. Similarly, Senator Allott indicated his view that while a union had a right to make "reasonable rules" punishing undesirable conduct, such as drunken behavior, it did not have a right to make criticism impermissible. *Id.* at 6027. In response to the concerns expressed that the "reasonable rules" language would restrict the rights of union members to dissent and criticize, Senator Kuchel stated "for the sake of the legislative history" that this was not the intention of the substitution. *Id.* at 6026.

charging that removal from his official position violates the LMRDA bill of rights and to seek reinstatement as an appropriate remedy. *Newman v. Local 1101, Communications Workers*, 597 F.2d 833, 835 (2d Cir. 1979).[6] Certainly, the plain wording of the statute supports that conclusion. Section 529 states that it shall be unlawful "to fine, suspend, expel, or otherwise discipline" any member for exercising a protected right. 29 U.S.C. § 529. Removal from office would seem on at least some occasions to be a form of "discipline". Moreover, 29 U.S.C. § 412 independently grants a direct cause of action to union members "whose rights . . . have been infringed by any violation of this subchapter". *See Miller v. Holden*, 535 F.2d 912, 916 (5th Cir. 1976).[7] The member "may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate". 29 U.S.C. § 412.

█ Appellees' contention that union officials removed from office do not have a cause of action under 29 U.S.C. § 529 is largely based upon the way in which the words "otherwise disciplined" are used in a *different* section of the bill of rights, namely, 29 U.S.C. § 411(a)(5), which surrounds union punishments with specific procedural safeguards. That section states that "[n]o member of any labor organization may be fined, suspended, expelled, or otherwise disciplined" without notice and hearing. 29 U.S.C. § 411(a)(5)(A) and (C). There is convincing legislative history to show that the words "otherwise disciplined" in *that* clause do not encompass "removal from office." *Grand Lodge of International Ass'n of Machinists v. King*, 335 F.2d 340, 345 (9th Cir.), *cert. denied*, 379 U.S. 920, 85 S.Ct. 274, 13 L.Ed.2d 334 (1964). In our opinion, however, the prevailing view of the circuits, which *allows* a cause of action under § 529, *Bradford v. Textile Wkrs. of America, AFL–CIO*, 563 F.2d 1138, 1141–42 (4th Cir. 1977),[8] not only avoids a strained [9] interpre-

---

6. *Accord, Bradford v. Textile Wkrs. of America, AFL–CIO*, 563 F.2d 1138 (4th Cir. 1977); *Cooke v. Orange Belt District Council of Painters*, 529 F.2d 815 (9th Cir. 1976); *Gabauer v. Woodcock*, 520 F.2d 1084 (8th Cir. 1975), *cert. denied*, 423 U.S. 1061, 96 S.Ct. 800, 46 L.Ed.2d 653 (1976); *Wood v. Dennis*, 489 F.2d 849 (7th Cir. 1973) (en banc), *cert. denied*, 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974).

   *But see Wambles v. International Bro. of Teamsters, Chauffeurs*, 488 F.2d 888, 889–90 (5th Cir. 1974); *Martire v. Laborers' Local Union 1058*, 410 F.2d 32, 35 (3rd Cir.), *cert. denied*, 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179 (1969); *Sheridan v. United Brotherhood of Carpenters Local 626*, 306 F.2d 152, 156–57 (3rd Cir. 1962).

7. *See Newman v. Local 1101, Communications Workers*, 597 F.2d 833 (2d Cir. 1979); *Schonfeld v. Penza*, 477 F.2d 899 (2d Cir. 1973); *Salzhandler v. Caputo*, 316 F.2d 445 (2d Cir.), *cert. denied*, 375 U.S. 946, 84 S.Ct. 344, 11 L.Ed.2d 275 (1963); Atleson, *A Union Member's Right of Free Speech and Assembly: Institutional Interests and Individual Rights*, 51 Minn.L.Rev. 403, 483 n.245 (1967).

8. *Accord, Cooke v. Orange Belt District Council of Painters*, 529 F.2d 815, 819 (9th Cir. 1976); *Gabauer v. Woodcock*, 520 F.2d 1084, 1091, 1093 n.13 (9th Cir. 1975), *cert. denied*, 423 U.S. 1061, 96 S.Ct. 800, 46 L.Ed.2d 653 (1976); *Wood v. Dennis*, 489 F.2d 849, 852–54 (7th Cir. 1973) (en banc), *cert. denied*, 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974); *see*

Beaird and Player, *Free Speech and the Landrum-Griffin Act*, 25 Ala.L.Rev. 577, 585 (1973); Etelson and Smith, *Union Discipline under the Landrum-Griffin Act*, 82 Harv.L.Rev. 727, 738 (1968); Note, *Union Members' Free Speech Guarantee: Does It Protect Against Discharge from Union Office?*, 29 Buffalo L.Rev. 169 (1980).

   *But see Martire v. Laborers' Local Union 1058*, 410 F.2d 32, 35 (3rd Cir.), *cert. denied*, 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179 (1969); *Sheridan v. United Brotherhood of Carpenters Local 626*, 306 F.2d 152, 156–57 (3rd Cir. 1962). For discussions of *Sheridan*, *Martire* and *Wambles v. International Bro. of Teamsters, Chauffeurs*, 488 F.2d 888, 889–90 (5th Cir. 1974), see *Bradford v. Textiles Wkrs. of America, AFL–CIO*, 563 F.2d at 1148 n.6; *Wood v. Dennis*, 489 F.2d 849, 854 (7th Cir. 1973) (en banc), *cert. denied*, 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974).

   We note that *Sheridan* represented the view of only one judge on the panel. Moreover, in *Martire*, the basis for the court's ruling was that Section 529 was inapplicable because the complainant's removal "in no way resulted from the exercise by him of any right guaranteed by the Act." 410 F.2d at 35 n.4.

9. If one were to find no cause of action because of the interpretation of the word "discipline" in Section 529, then it would be necessary to interpret away Section 412 which grants a cause of action to union members "whose

tation of the statute's wording, but also more effectively carries out its basic intent—to guarantee union democracy. It is easy to imagine circumstances where members' rights of expression would mean little were the union totally free to remove any and all officials who expressed their point of view. *Bradford v. Textile Wkrs. of America, AFL–CIO*, 563 F.2d at 1142. Given the many varieties of union officials and the flexibility inherent in the statutory language, there is no reason to provide a broad blanket exemption allowing removal of any and all union officials—especially for engaging in activities which the bill of rights protects.[10] Moreover, it is not unusual for similar words in different parts of a statute to take on different meanings in light of different Congressional purposes. The Ninth Circuit in *Grand Lodge of International Ass'n of Machinists v. King*, 335 F.2d at 344–46, has convincingly demonstrated that this is just such a circumstance.[11] For the reasons set out in the Ninth Circuit's *King* opinion, and others here mentioned, we hold that a union official who alleges he has been removed from office in retaliation for exercising rights guaranteed by 29 U.S.C. § 411(a)(2), states a cause of action under 29 U.S.C. §§ 412 and 529.

██ Of course, in applying § 411(a)(2) to a union's removal of an official, courts must be particularly sensitive to the union's administrative and representational needs. As applied to members, § 411(a)(2) grants an "almost absolute free speech right". *Turner v. Air Transport Lodge 1894, Etc.*, 590 F.2d 409, 410 (2d Cir. 1978), *cert. denied*, 442 U.S. 919, 99 S.Ct. 2841, 61 L.Ed.2d 286 (1979). It provides a far ranging protection to the "rights of union members to discuss freely and to criticize the management of their union and the conduct of their officers". *Salzhandler v. Caputo*, 316 F.2d 445, 448–49 (2d Cir.), *cert. denied*, 375 U.S. 946, 84 S.Ct. 344, 11 L.Ed.2d 275 (1963).

The rights of officers to engage in speech and expression, however, must be more carefully circumscribed. As the Second Circuit has stated:

although a person is free as a union member to criticize mercilessly his union's management and its policies, once he accepts a union position obligating him fairly to explain or carry out the union's policies or programs, he may not engage in conduct inconsistent with these duties without risking removal as an official or employee (but not as a union member) on the ground that his conduct precludes his effective representation of the union. Unless the management of a union, like that of any other going enterprise, could command a reasonable degree of loyalty and support from its representatives, it could not effectively function very long.

*Newman v. Local 1101 Communications Wkrs., Etc.*, 570 F.2d 439, 445 (2d Cir. 1978). Thus, a union member, while acting as the union's agent, may not "sabotage or subvert its policies in the name of free speech," *id.*, or engage in "activities diametrically opposed to the performance of his specified duties." *Sewell v. Grand Lodge of Int. Ass'n of Mach. & Aero. Wkrs.*, 445 F.2d 545, 551 (5th Cir. 1971), *cert. denied*, 404 U.S. 1024, 92 S.Ct. 674, 30 L.Ed.2d 674 (1972).

██ In drawing the "fine line" between insubordination and freedom of speech, *Wood v. Dennis*, 489 F.2d 849, 855–56 (7th Cir. 1973) (en banc), *cert. denied*, 415 U.S. 960, 94 S.Ct. 490, 39 L.Ed.2d 575 (1974), in "removal from union position" cases, we must balance plaintiffs' interest in free speech and expression against whatever legitimate union concerns may warrant limitations upon those activities. In doing so here, we believe three factors should be taken into account.

---

rights ... have been infringed by any violation of this subchapter". 29 U.S.C. § 412.

**10.** *But see Sheridan v. United Brotherhood of Carpenters Local 626*, 306 F.2d 152, 156–57 (3rd Cir. 1962) (union bill of rights protects the rights of members, not of officers.)

**11.** *But see Wood v. Dennis*, 489 F.2d 849, 858 (7th Cir. 1973) (Judge, now Justice, Stevens, concurring in the result.)

First, we shall consider the precise nature of the activity for which the official has been disciplined. To what extent is it aptly characterized as "pure speech" or "expression"? To what extent does it constitute a course of conduct inconsistent with his official duties?

Second, we shall consider the role of the official within the union. What are his duties? To what extent does his position call for absolute loyalty? To what extent will the expression at issue interfere with the effective performance of his duties?

Third, we shall consider the extent to which any legitimate union interest may be protected by "reasonable rules"—which the statute expressly permits. Is the conduct at issue in violation of any such reasonable union rules, regulations, or practices? Deference to reasonable rules in this area, as the statute requires, makes sense both because it helps to preserve union autonomy and self-government and because rules or practices offer evidence that the union's disciplining power is not being used selectively to censor an individual or a particular point of view.

### III.

In applying these principles to the case before us, we start by recognizing that plaintiff, on a motion for preliminary injunction, must show that "in the absence of its issuance he will suffer irreparable injury and also that he is likely to prevail on the merits". *Nat. Tank Truck Carriers, Inc. v. Burke*, 608 F.2d 819, 823 (1st Cir. 1979) (quoting *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975)). The issuance of a preliminary injunction lies within the sound discretion of the trial court. *Grimard v. Carlston*, 567 F.2d 1171, 1173 (1st Cir. 1979). We will not lightly overturn that judgment. *Nat. Tank Truck Carriers, Inc. v. Burke*, 608 F.2d at 823; *Walker v. Providence Journal Co.*, 493 F.2d 82, 87 (1st Cir. 1974); *Automatic Radio Mfg. Co. v. Ford Motor Co.*, 390 F.2d 113, 115 (1st Cir.), *cert. denied*, 391 U.S. 914, 88 S.Ct. 1807, 20 L.Ed.2d 653 (1968). Nonetheless, in this instance we reverse the district court, for we believe, on the basis of the record made thus far, that plaintiff is likely to show that he has been disciplined for having engaged in protected speech and expression.

We first consider the type of conduct for which Maceira was dismissed. The record provides evidence of only three reasons for Maceira's dismissal. And, each reason relates primarily to speech and expression. Those reasons, as specified in Pagan's letter to Maceira, consist of (1) Maceira's criticism of the way in which the Local handled a member's (Angel Martinez) grievance; (2) Maceira's press conference on the subject of a Christmas bonus for the workers; and (3) Maceira's conduct at a meeting held on December 7, 1979. We shall briefly discuss each.

The Martinez matter arose out of the Hotel La Concha's dismissal of Angel Martinez, a member of Maceira's bargaining unit. Maceira and Martinez apparently believed that Martinez had a legitimate arbitrable grievance. The Local did not initiate a grievance proceeding, however, until after the contractually-provided time for bringing it had expired; the grievance was therefore dismissed. Maceira criticized Pagan and the Local for their handling of the matter. Maceira testified that he raised the Martinez grievance and voiced his criticism at meetings on October 31 and on November 1, 1979. He claims that many union members supported him. He admits that he used the incident as an example of why many members were dissatisfied with the Union. Pagan concedes that Maceira did not use insulting language. Pagan claims that the first time the Martinez matter came up, on October 31, Maceira "maintained absolute silence", but one day later Maceira presented himself as "the great defender" of Martinez and enunciated "defamatory criticism against the Union". It is plain from the record that, whichever account is credited, Maceira's conduct consisted of speech critical of the performance

of certain union officials.[12]  And, the speech concerns proper grievance handling—the precise subject matter of Maceira's official duties.  To be sure, Pagan intimated in his letter of December 21, 1979 that he took offense at Maceira's "silence" on October 31, but we can find nothing in the record which indicates how silence on that date, if true, violated Maceira's duty to the union or transformed Maceira's criticism into grounds for dismissal.

■ The second reason for Maceira's dismissal consisted of his having held a press conference about Christmas bonuses.  Under Puerto Rico law, employers are required to pay a bonus at Christmas as long as they maintain a certain level of profits.  Hotel officials evidently told Maceira that they had insufficient profits to pay a Christmas bonus in 1979.  Maceira and his deputy steward Jimenez testified without contradiction that they and other Unit members discussed the matter with Pagan in August 1979.  They urged that action be taken.  Pagan expressed no opposition, nor did he tell Maceira or Jimenez what to do next.  On November 22, Maceira wrote to the local Department of Labor asking for an audit of hotel books.  And, on November 30 he held a press conference, issuing a press release which stated that hotel revenues had increased, that executives had received a Christmas bonus, that ordinary workers would not receive a bonus, and that a Labor Department audit had been requested.  Pagan claims that the press conference was unauthorized.  The record shows, however, that Maceira held at least one other press conference with neither prior authority nor

subsequent admonition; it fails to show any rule or practice under which Maceira was required to obtain prior union authorization; nor does it show that Pagan told Maceira in advance not to hold the conference.[13]  While the unauthorized holding of a press conference by a subordinate union official or steward might constitute a basis for dismissal if done contrary to established rule, practice or higher order, we see no such basis here, especially since the substantive position taken at the conference was in conformity with later union policy.

■ Pagan's final reason for dismissing Maceira consists of Maceira's conduct at a meeting of stewards on December 7, 1979 at the Sheraton Hotel.  Viewing the evidence at the hearing in a light most favorable to Pagan, the record shows that on November 28 Pagan summoned stewards from several different bargaining units to an official meeting on December 7.  Employers were to excuse the stewards from their work to allow them to attend.  A few days later Maceira and the La Concha Hotel stewards learned that the meeting would in fact be a party.  They decided to attend and to raise such matters as the Christmas bonus question and the failure of the Local to hold monthly Stewards' Council meetings.  When Maceira and his supporters arrived at the party, the bar was open.  Some stewards present had a copy of TALC's magazine, which strongly criticized Pagan.  Maceira circulated among the tables and the bar, telling the members and Pagan that they should discuss serious union business before celebrating.  Pagan testified that before the meeting was called to order,

12.  The district court found fault with Maceira's other activities on behalf of Martinez.  The record indicates that after Martinez came to Maceira for help, Maceira aided him in attempting to secure the advice of counsel regarding a possible suit against the union because of its failure to process his grievance on time.  There is no reason to conclude that these efforts by Maceira were inconsistent with his duties; in any event, nothing was made of this matter by Pagan in his letter of December 21.

13.  A further concern of defendants over Maceira's Christmas bonus activities centers on their claim that he sought to aggrandize his

position, without acknowledging his union affiliation.  In the letter of November 22, however, Maceira clearly indicated his union affiliation.  Moreover, a newspaper article covering the November 30th press conference explicitly states that Maceira was associated with the Teamsters Union.

We also note that on December 28, 1979, Pagan himself wrote the Department of Labor of Puerto Rico, requesting an investigation of the Christmas Bonus matter, thereby demonstrating that Maceira's actions did not conflict with union policy.

Maceira closed the bar,[14] took the microphone that was in place and moved that the agenda be amended. Pagan and his brother directed insults at Maceira, suggesting he was a frontman for TALC. The meeting was then called to order, a quorum declared and the agenda read. Maceira's motion to discuss serious business was defeated. Pagan delivered a Christmas message. New business was called for; Maceira renewed his motion; it was defeated again. Maceira and his supporters left the party. Pagan testified that Maceira insulted the remaining stewards as he was leaving. In sum, Maceira's conduct here seems at worst to have consisted of having tried to raise criticisms of Pagan at a union meeting and having exchanged one set of insults for another.

In addition to these three incidents, the record contains some evidence that Maceira was a supporter of TALC. But that evidence is not developed to the point where one can determine whether it constitutes a ground for Maceira's dismissal. TALC appears to be a group of union dissidents dissatisfied with Pagan, though there is also evidence that some of its members did not belong to the union. There is no evidence that support of a group such as TALC was inconsistent with Maceira's duties as a steward or why there might be any such inconsistency or why Maceira was never explicitly told of any such inconsistency. There is no evidence as to whether TALC primarily opposed union policies or primarily opposed Pagan.[15] Rather, the record, in its present state, indicates that Maceira's dismissal was based upon the holding of a press conference and two instances in which Maceira arguably criticized the manner in which the Local was implementing its policies, all of which concern matters of importance to the workers who elected him. Thus, the conduct that underlies the "discipline" in this case would seem to be close to pure speech and expression.

Next, we shall consider the nature of Maceira's union position, in an effort to assess whether legitimate union interests called for loyalty to the point where Maceira could be removed from office for engaging in the activity described above. The duties of a union steward are set out in Article 29 of the Teamsters' Constitution and by-laws. One shop steward is chosen for each crew of twenty-five members. He is the "highest ranking member" in his crew. He "shall advocate and promote all union projects"; he "shall process all grievances"; and he is responsible for maintaining signature cards needed to keep records up to date. A shop steward attends meetings of the Shop Stewards' Council, which advises officers of the union. Shop stewards are elected for one year. They can be recalled. They are neither salaried nor bonded; they are not authorized to handle union property; they have no official policy-making function; as has been noted, they are not officers or agents of the union. In sum, the role of a steward is limited; he finds himself somewhere between "union agent" and "ordinary union member." Neither this description of his duties nor any other evidence in the record shows why a steward should lose the freedom to criticize other union officials in circumstances such as were presented here. He is not a policy-making officer. He primarily processes grievances. As the union official closest to the members themselves, he might well be expected to communicate their needs, feelings, complaints, and grievances to union officials. This is not to say there are no limits to what a steward may properly say and do, but no such limits were transgressed here. *See Newman v. Local 1101 Communications Wkrs., Etc.*, 570 F.2d at 445. *Compare N.L.R.B. v. Wilson Freight Co.*, 604 F.2d 712, 714–21, 724 (1st Cir. 1979).

Finally, in a further effort to weigh the union's interests, we look to see if Maceira's

---

14. The record does not support the trial court's finding that Maceira "forcefully" attempted to close the bar.

15. The district judge assumed for the purposes of the action before him that Maceira's association with TALC fell within the free speech and assembly protection of 29 U.S.C. § 411(a)(2).

activities violated a "reasonable rule" of the union. We find no evidence in the record that Maceira's conduct violated any rule, regulation or practice of the union. *Compare N.L.R.B. v. Wilson Freight Co.*, 604 F.2d at 724–28. There is certainly no rule prohibiting a shop steward from criticizing the Local's late processing of a grievance. Maceira, on December 7, sought to bring up his criticisms in accordance with the meeting's procedural rules. The union has not suggested that Maceira violated any of the Standing Rules for Union Meetings set out in Article 24 of the by-laws. Moreover, the union has no rule forbidding a shop steward from holding a press conference, nor was any practice or order along those lines reported at the hearing below. Indeed, Maceira held a press conference in support of the striking Hotel Caribe workers and he was not criticized for doing so. While the union has a clause in its by-laws prohibiting dual unionism, disaffiliation movements, slander and libel, Maceira was not charged under these provisions, nor did Pagan make any reference to them. Thus, the union has not seen fit to proscribe by general rule, or even informal practice, the type of activity in which Maceira engaged—a fact that further indicates that such conduct (at least when engaged in by shop stewards) was not thought to interfere significantly with legitimate union interests.

Under these circumstances, we conclude that Maceira has made a showing that he is likely to succeed in his claim that his dismissal violated his rights of expression protected by § 411(a)(2). We also believe that plaintiffs have made a sufficient showing of irreparable injury. It is well established that the loss of first amendment freedoms constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976); *see also Keefe v. Geonakos*, 418 F.2d 359 (1st Cir. 1969). Similar considerations operate in the context of the LMRDA's bill of rights, which is aimed at protecting in the union context freedoms analogous to those that the first amendment safeguards from governmental interference. In this instance several plaintiffs have stated in affidavits that they hold views similar to those of Maceira and that, since Maceira's removal, they fear reprisal if they speak out in support of those views as forcefully as did Maceira. The assertions in the affidavits are plausible; the record contains no evidence to the contrary. Moreover, Maceira has testified that he has been less free in expressing himself since his removal. Thus, plaintiffs have made out a plausible claim of a "chilling effect" on the exercise of their rights of expression. Such a showing meets the "irreparable harm" requirement both in the context of the first amendment, *Chicago Area Military Project v. City of Chicago*, 508 F.2d 921, 926 (7th Cir.), *cert. denied*, 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483 (1975), and the LMRDA, *Wood v. Dennis*, 489 F.2d at 855; *Ostrowski v. Utility Workers Local 1–2*, 104 L.R.R.M. 2343 (S.D.N.Y.1980).

Accordingly, the order of the district court denying preliminary injunctive relief is vacated, and the case is remanded with the direction that pending decision of the merits the district court enter a preliminary injunction reinstating Maceira to his former union position.[16]

■ *Vacated and remanded. Costs on appeal to appellants.*[17]

---

16. Maceira's union position has been left vacant since his removal.

17. Appellants request that we order the district court to award them interim attorneys' fees and costs for the proceedings below. Given the preliminary posture of this action, however, it is appropriate that application be made in the first instance to the district court.